**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARIE DEMARIA, | ) | |
| SHERI GRIMM, | ) | |
| JUANITA WALKER, | ) | |
| DOUG BURKHOLDER, | ) | |
| KEITH SIEFKEN, | ) | |
| HERB BROWN, | ) | |
| CANDANCE KIXMILLER, | ) | |
| ROSLYN CORBIN, | ) | |
| DENNIS BIRD, | ) | |
| NITZALI BELTRAN-ASHLINE, | ) | |
| DONALD YOUNG, | ) | |
| TWILA ASHWORTH, | ) | |
| THOMAS WILBUR, | ) | |
| PETER PETERSON, | ) | |
| JOSEPH MILLER, | ) | |
| TAMMY PETTY, | ) | |
| LAURIE SAUDER, and | ) | |
| GARY OLDS, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-CV-03321 |
| | ) | |
| NISSAN NORTH AMERICA, INC., | ) | Hon. John Robert Blakey |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO NISSAN NORTH
AMERICA'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.    BACKGROUND ...............................................................................................2

      A.    Factual Allegations. ..............................................................................2

II.   LEGAL STANDARD....................................................................................5

III.  ARGUMENT .................................................................................................6

      A.    This Court has Personal Jurisdiction over Nissan...............................6

            1.    Nissan's Long-Arm Statute Analysis Relies On Inapplicable Law.......6

            2.    Plaintiff DeMaria Adequately Alleges Specific Personal Jurisdiction and the Court May Exercise Pendent Personal Jurisdiction Over the Remaining Claims...................................................................................7

            3.    Absent Pendent Personal Jurisdiction, Nissan's Contacts are Sufficiently "Related to" the Remaining Claims to Justify Personal Jurisdiction...........................................................................................10

            4.    Personal Jurisdiction Is Fundamentally Fair and Promotes Efficiency11

      B.    Plaintiffs Have Adequately Alleged that Nissan Knew of the Floorboard Defect..................................................................................................14

            1.    Knowledge May Be Alleged Generally Under Rule 9(b)...................14

            2.    Plaintiffs' Knowledge Allegations Are Plausible................................17

            3.    The Alleged Safety Risks Are Plausible .............................................19

      C.    Nissan Had a Duty to Disclose the Defect........................................21

            1.    Nissan Must Disclose Safety Defects .................................................21

            2.    Plaintiffs' Claims Are Pled With Particularity ...................................22

      D.    Plaintiffs' implied-warranty-of-merchantability claim does not fail, because (1) Plaintiffs allege defects that exist at the point of sale, (2) any alleged warranty limitation has been tolled and/or is unconscionable, and (3) privity is not a bar.......................................................................................25

      E.    The economic loss doctrine does not preclude Plaintiff Corbin's negligence claim under Maryland law. ................................................................28

IV.   Conclusion ...................................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Abels v. Farmers Commodities Corp.*,
    259 F.3d 910, 920 (8th Cir. 2001) ...................................................................................24

*Arista Records LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ..........................................................................................15

*Arnett v. Webster*,
    658 F.3d 742 (7th Cir. 2011) ....................................................................................6, 17

*Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty.*,
    480 U.S. 102 (1987) ......................................................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009). ..................................................................................................6, 15

*Autotech Controls Corp. v. K.J. Elec. Corp.*,
    628 N.E.2d 990 (Ill. App. Ct. 1993) ...............................................................................7

*Banwell v. Illinois Coll. of Optometry*,
    981 F. Supp. 1137 (N.D. Ill. 1997) .................................................................................9

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 554 (2007) ...................................................................................................6, 15

*Blaue v. Kissinger*,
    No. 03 C 9025, 2006 WL 2092380 (N.D. Ill. July 24, 2006)............................................20

*Blue Cross and Blue Shield v. Philip Morris, Inc.*,
    No. 98 C 2612, 1999 WL 202928 (N.D. Ill. Mar. 31, 1999)................................................9

*Burdt v. Whirlpool Corp.*,
    No. C 15-01563, 2015 WL 4647929 (N.D. Cal. Aug. 5, 2015)..........................................14

*C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd.*,
    626 F. Supp. 2d 837 (N.D. Ill. 2009) .............................................................................9

*Carlson v. Gen. Motors Corp.*,
    883 F.2d 287 (4th Cir. 1989).........................................................................................27

*Cholakyan v. Mercedes-Benz USA, LLC*,
    796 F. Supp. 2d 1220 (C.D. Cal. 2011)...........................................................................26

*Club Assistance Program, Inc. v. Zukerman*,
    594 F. Supp. 341 (N.D. Ill. 1984) ...................................................................................7

*Coffey v. Foamex, L.P.*,
  2 F.3d 157 (6th Cir. 1993) ...................................................................................24

*Connick v. Suzuki Motors Co., Ltd.*,
  675 N.E.2d 584  (Ill. 1996 ...................................................................................21

*Corley v. Rosewood Care Center, Inc.*,
  142 F.3d 1041 (7th Cir. 1998) .............................................................................24

*Coss v. Playtex Products*,
  No. 08 C 50222, 2009 WL 2245657 (N.D. Ill. July 10, 2009) ...........................16

*Craftmatic Sec. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989) .................................................................................24

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014) ..................................................................................8, 12, 14

*Daugherty v. Am. Honda Motor Co.*,
  51 Cal. Rptr.3d 118 (2006) ...................................................................................22

*Doll v. Ford Motor Co.*,
  814 F. Supp. 2d 526, 547 (D. Md. 2011) ...............................................16, 27, 28

*Elias v. Hewlett-Packard Co.*,
  No. 12-CV-00421, 2014 WL 493034 (N.D. Cal. Feb. 5, 2014) ..........................15

*Greene v. BMW of N. Am.*,
  No. 2:11-04220, 2014 WL 47940 (D. N.J. Jan. 7, 2014). ...................................16

*Gunderson v. ADM Investor Services, Inc.*,
  230 F.3d 1363 (8th Cir. 2000) .............................................................................24

*Henderson v. Volvo Cars N. Am. LLC*,
  No. 09-4146, 2010 U.S. Dist. LEXIS 73624 (D.N.J. July 21, 2010) ..................27

*Heritage House Restaurants, Inc. v. Cont'l Funding Group, Inc.*,
  906 F.2d (7th Cir. 1990), ........................................................................................7

*Hornberger v. General Motors Corp.*,
  929 F. Supp. 884 (E.D. Pa. 1996) ........................................................................26

*Hyatt Intern. Corp. v. Coco*,
  302 F.3d 707 (7th Cir. 2002) ......................................................................7, 8, 11

*Illinois v. Hemi Group LLC*,
  622 F.3d 754, (7th Cir. 2010) .................................................................................6

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d (7th Cir. 2002) .......................................................................................12

iii

*In re Caterpillar, Inc., C13 and C15 Engine Products Liability Litigation*,
   MDL No. 2540, 2015 WL 4591236 (D.N.J. July 29, 2015) ...............................................24

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*,
   No. 03-4558 (HAA), MDL 1687, 2008 U.S. Dist. LEXIS 73690 (D.N.J. 2008) ...............27

*In re MyFord Touch Consumer Litig.*,
   46 F. Supp. 3d 936 (N.D. Cal. 2014) ...........................................................20, 21, 22, 26

*In re Nissan Radiator*,
   No. 10 CV 7493 (VB), 2013 U.S. Dist. LEXIS 116720 (S.D.N.Y. May 30, 2013) ...........26

*In re Porsche Cars North America, Inc.*,
   880 F. Supp. 2d 801 (S.D. Ohio 2012)........................................................................passim

*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*,
   684 F. Supp. 2d 942 (N.D. Ohio 2009) ............................................................................17

*Indiana Nat'l Bank of Indianapolis v. De Laval Separator Co.*,
   389 F.2d (7th Cir. 1968).................................................................................................26

*Indus. Models, Inc. v. SNF, Inc.*,
   No. 14 C 8340, 2015 WL 2399089, (N.D. Ill. May 18, 2015)...............................................8

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*,
   326 U.S. 310 (1945) .........................................................................................................11

*Johnson v. Creighton Univ.*,
   No. 14 C 4622, 2015 WL 4247781  (N.D. Ill. July 14, 2015)...............................................11

*Keegan v. Am. Honda Motor Co.*,
   838 F. Supp. 2d 929 (C.D. Cal. 2012).................................................................................16

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) .........................................................................................................11

*Kipp v. Ski Enter. Corp. of Wisconsin, Inc.*,
   783 F.3d 695 (7th Cir. 2015)...............................................................................................8

*Lake v. Unilever U.S., Inc.*,
   964 F. Supp. 2d 893 (N.D. Ill. 2013) ................................................................................27

*Lewis v. Vin Devers Mercury, Inc.*,
   111 Ohio App. 455 (1959) ................................................................................................27

*Lloyd v. General Motors Corp.*,
   916 A.2d 257 (Md. 2007)..................................................................................................28

*Logan Prods., Inc. v. Optibase, Inc.*,
   103 F.3d 49 (7th Cir. 1996)...............................................................................................11

*MacDonald v. Ford Motor Co.*,
  37 F. Supp. 3d 1087 (N.D. Cal. 2014) .............................................................23

*Maldonado v. Dominguez*,
  137 F.3d 1 (1st Cir. 1998 ..................................................................................24

*Michaels Bldg. Co. v. Ameritrust, Co., N.A.*,
  848 F.2d 674 (6th Cir. 1988)..............................................................................24

*Mickens v. Ford Motor Co.*,
  No. 10-CV-5842, 2015 WL 5310755 (D.N.J. Sept. 10, 2015) ...........................15

*Miller Pipeline Corp. v. British Gas plc*,
  901 F. Supp. 1416 (S.D. Ind. 1995) .....................................................................9

*Mui Ho v. Toyota Motor Corp.*,
  931 F. Supp. 2d 987 (N.D. Cal. 2013) ..................................................15, 19, 22

*Naiser v. Unilever United States, Inc.*,
  975 F. Supp. 2d 727 (W.D. Ky. 2013) ...............................................................27

*Nelson v. Nissan N. Am., Inc.*,
  894 F. Supp. 2d 558 (D.N.J. 2012) ....................................................................25

*Pack v. Damon Corp.*,
  No. 04-2163, 2006 U.S. App. LEXIS 2303 (6th Cir. Mich. 2006) .....................28

*Philips v. Ford Motor Company*,
  No. 14-CV-02989, 2015 WL 4111448 (N.D. Cal. July 7, 2015) ....................20, 21, 22, 23

*Priebe v. Autobarn, Ltd.*,
  240 F.3d (7th Cir. 2001) ....................................................................................26

*Purdue Research Found. v. Sanofi–Synthelabo, S.A.*,
  338 F.3d 773 (7th Cir. 2003) ..............................................................................11

*Robinson Eng'g Co. Pension Plan & Trust v. George*,
  223 F.3d (7th Cir. 2000) ......................................................................................9

*Rogers v. Toni Home Permanent Co.*,
  167 Ohio St. 244 (1958) .....................................................................................27

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*,
  786 F.3d 510 (7th Cir. 2015) ..........................................................................6, 17

*Russian v. DaimlerChrysler Corp.*,
  411 F. Supp. 2d 614 (M.D.N.C. 2005) ...............................................................27

*Sater v. Chrysler Group LLC*,
  No. EDCV 14-00700-VAP, 2015 U.S. Dist. LEXIS 21022 (C.D. Cal. Feb. 20, 2015).......26

*Sheris v. Nissan North America, Inc.,*
   No. 07-2516 (WHW), 2008 U.S. Dist. LEXIS 43664 (D.N.J. June 2, 2008) ....................26

*Smith v. Ford Motor Corp.,*
   749 F. Supp. 2d 980 (N.D. Cal. 2010) ................................................................................22

*Stevenson v. Mazda Motor of Am., Inc.,*
   No. 14-5250 (FLW)(DEA), 2015 U.S. Dist. LEXIS 70945 (D.N.J. June 2, 2015), ...........26

*Terry v. TMX Fin. LLC,*
   No. 13 C 6156, 2014 WL 2066713 (N.D. Ill. May 19, 2014)......................................10, 11

*Tucker v. Bank One, N.A.,*
   265 F. Supp. 2d 923(N.D. Ill. 2003) ...................................................................................9

*United Airlines, Inc. v. Zaman,*
   14 C 9214, 2015 WL 2011720 (N.D. Ill. Apr. 30, 2015).............................................6, 7, 8

*Williams v. Yamaha Motor Corp., U.S.A.,*
   No. CV 13-05066, 2015 WL 2375906 (C.D. Cal. Apr. 29, 2015).......................................15

*World-Wide Volkswagen Corp. v. Woodson,*
   444 U.S. 286 (1980) ..........................................................................................................12

**Other Authority**

28 U.S.C. § 1367....................................................................................................................10

735 ILCS 5/2-209(c) ...............................................................................................................6

Ill. Rev. Stat. ch. 110,
   ¶ 2–209 (1988). ..................................................................................................................7

Restatement (Second) of Conflict of Laws
   § 127 (1971) .......................................................................................................................16

Racketeer Influenced and Corrupt Organizations Act ("RICO"),
   18 U.S.C. § 1965(b) ............................................................................................................9

Uniform Commercial Code ("UCC") § 2-314 ......................................................................26

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................................12

Rule 12(b)(6)...........................................................................................................................5

Rule 23 ...................................................................................................................................12

Rule 9(b). .........................................................................................................................14, 16

Although it spans thirty pages, Nissan's motion to dismiss never squarely addresses what this case is about. In fact, after reading Nissan's motion, one would think that this case is about nothing more serious than a few car owners upset that their vehicles eventually showed signs of rust. Nissan knows, however, that sporadic rust is not what led drivers to initiate a federal lawsuit. Nor is it what spurred *The Today Show* and others to express outrage that Nissan has refused to issue a safety recall. Instead, the floorboards in the vehicles at issue are rusting completely through—the only real barriers between passengers and the road are developing holes "big enough to stand in."[1] While these holes have drawn some in the media to recall the old Flintstone cartoons (where a prehistoric car is powered by a driver pedaling his feet on the ground), concerned drivers are not laughing. With modern "unibody" vehicle construction, every car's structural integrity depends on each of its steel panels being sound. In other words, even if these large rust holes do not allow a rock or nail to fly through in every instance, they will almost certainly weaken the vehicle's ability to maintain its structural integrity in the event of a crash.

Given the seriousness of the problem, it is perhaps understandable that Nissan has chosen to focus on procedural objections. Nissan's lead argument is that the eighteen Plaintiffs (who coordinated their suits before a single Court to avoid inefficiency and duplication of efforts) should instead be required to file their suits separately in different courts across the country. The only result from Nissan's proposal would be delay—separate cases would just lead to MDL proceedings, which in turn would coordinate and transfer the cases back before a single judge. Nissan's jurisdictional argument should therefore be rejected.

---

[1] "Nissan won't recall severely rusted Altimas," *The Today Show*, http://www.today.com/video/today/57207985 (Apr. 6, 2015).

1

Nissan's other procedural arguments fare no better. Nissan argues that Plaintiffs' complaint lacks the requisite detail under Rule 9(b), but Nissan's view of what 9(b) requires differs markedly from what most courts have held. Plaintiffs are not required, for example, to have "inside information" about who within Nissan chose to cut costs by deviating from decades-long anticorrosion techniques. Likewise, Plaintiffs need not plead which of the pre-sale, industry-standard corrosion tests Nissan employed—particularly since every one of those tests would reveal the same thing: class vehicles' floorboards will develop massive rust holes. As this case progresses, Plaintiffs intend to submit expert testimony that will help explain the relevant technology, including why the very size of the floorboard rust holes itself demonstrates that this problem necessarily resulted from a conscious decision by Nissan to deviate from standard (but expensive) anticorrosion techniques. Because the pleading stage is not the time for expert reports, however, and because Plaintiffs have not yet had the opportunity to take even basic discovery, Nissan's arguments should be rejected.

## I.     BACKGROUND

### A. Factual Allegations.

For much of the twentieth century, corrosion posed serious challenges in the design and manufacture of mass-produced automobiles. FAC ¶ 32. But in today's modern era, the problem of unabated corrosion has largely been solved. FAC ¶ 33. Anticorrosion techniques are now both ubiquitous and reliable, including the use of corrosion-resistant materials, coated steels, sealers, and polymers. FAC ¶¶ 33–34. Although these techniques do not eliminate all rust, they make it virtually impossible for large-scale, unabated corrosion to occur, particularly in structural components that help protect drivers and passengers in the event of a collision. FAC ¶ 34.

In the early 2000s, however, when Nissan designed and manufactured its 2002–2006

2

Altima and 2004–2008 Maxima models (the "Class Vehicles"), it chose to deviate from industry-standard anticorrosion techniques. The levels of floorboard corrosion in Class Vehicles allow no other explanation. To date, more than 400 drivers have complained to the National Highway Traffic Safety Administration (NHTSA) about the problem, a remarkable number since most drivers are not familiar with the NHTSA and complain, if at all, directly to Nissan or one of its dealerships. Thus, there are likely to be thousands more vehicles all over the country with large floorboard holes developing. FAC ¶ 41.

Nissan likely chose to deviate from normal anticorrosion methods because those methods are relatively expensive, and thus make for a tempting target for a manufacturer looking to cut costs. FAC ¶ 34. Even if Nissan did not outright intend to allow these levels of floorboard corrosion when it chose to deviate from standard anticorrosion methodologies, Nissan could not have failed to realize that danger before selling the vehicles. FAC ¶¶ 34–35. Every automotive manufacturer, including Nissan, runs extensive pre-sale tests on its vehicles, and these tests are especially intensive when a manufacturer is contemplating a switch to a new component or design. FAC ¶ 35. For corrosion concerns, there are a variety of reliable tests that predict the level of rust that will develop over time, including tests that detect levels of moisture dissipation and alloy changes. FAC ¶ 35. Use of any combination of these tests would have revealed that in Class Vehicles, normal moisture does not dissipate efficiently, causing floorboards to corrode at an accelerated rate, rust, and become structurally unsound. FAC ¶ 34.

The corrosion in Class Vehicles is particularly pernicious because it is so hard to detect. Inside the vehicle, the floorboard is concealed by carpeting. The corrosion thus often advances to a dangerous level before becoming visible, opening a large hole on the vehicle bottom. Even then, the corrosion will continue to spread until someone happens to be under

3

the car and looking up at the floorboard.  In other words, while Nissan's pre-sale tests looked ahead and predicted that the floorboards would badly corrode when exposed to moisture, Nissan's customers typically cannot detect the problem even after it has been festering for quite some time.  Nissan knows this, but rather than warning its customers, the company had doubled down on its decision to conceal it.  After this lawsuit was filed, the company issued a new repair bulletin, but only to its dealers.  It has not issued any warning notices to consumers and has not told its dealerships to inform drivers about the problem during routine servicing.  Thus, instead of being warned in advance, drivers are left to discover the problem on their own—only to be charged thousands of dollars to repair it.

A review of the complaints to the NHTSA reveals that the drivers who are fortunate enough to detect the problem recognize how serious it is.  Many drivers have noted the large size of the rust holes (e.g., "You can see my carpet through the bottom of my car on the driver's side."), have recognized that the problem is a "safety hazard" and "extremely dangerous," and some have said they were hit by external road debris.  FAC ¶¶ 41–42.  The following photographs illustrate the large rust holes.  FAC ¶ 37.





While the danger posed by gaping floorboard holes may seem obvious, it is particularly severe in light of Class Vehicles' unibody engineering design. Class Vehicles' frame and body consist of a combination of panels welded together to form a single unit, with each panel dependent upon the adjacent panels for strength and rigidity. Floorboard degradation thus not only allows debris and exhaust into the cabin, but in the event of a collision, it increases the chance of injury or death by reducing the vehicle's structural integrity (as well as that of the parts attached to the floorboard, such as passenger seating). As a result, States that require vehicle safety inspections will not allow automobiles with degraded floorboards to pass inspection, meaning many Class Vehicles cannot legally be driven due to the safety risks.

## II.   LEGAL STANDARD

A complaint may not be dismissed under Rule 12(b)(6) where, as here, a plaintiff pleads "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on

its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must liberally construe the complaint in the light most favorable to the plaintiff and accept factual allegations as true. *Id.* at 666. Rule 12(b)(6) "doesn't impose a probability requirement on plaintiffs: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.' The complaint must instead call for 'enough fact to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Arnett v. Webster*, 658 F.3d 742, 752 (7th Cir. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 556 (2007)). And "[u]nder the modern regime of the Federal Rules, the complaint need contain only factual allegations that give the defendant fair notice of the claim for relief and show the claim has substantive plausibility." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 517 (7th Cir. 2015) (internal quotations and citations omitted). Finally, Plaintiffs' "pleading burden should be commensurate with the amount of information available to them." *Id.* at 528.

## III. ARGUMENT

### A. This Court has Personal Jurisdiction over Nissan.

#### 1. Nissan's Long-Arm Statute Analysis Relies On Inapplicable Law

"[T]his Court may exercise personal jurisdiction over Defendant if it is (1) proper under the forum state's personal jurisdiction statute and (2) comports with the requirements of the Due Process Clause." *United Airlines, Inc. v. Zaman*, 14 C 9214, 2015 WL 2011720, at *3 (N.D. Ill. Apr. 30, 2015). The Illinois long-arm statute permits the exercise of jurisdiction "on any . . . basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c). Thus, the relevant determination is "whether exercising jurisdiction over Defendant comports with the Due Process Clause." *Illinois v. Hemi Group LLC*, 622 F.3d 754, 756–57 (7th Cir. 2010); *United Airlines, Inc.*,

2015 WL 2011720, at *3 ("Because the Seventh Circuit has found no 'operative difference' between the two constitutional limits, this Court will limit its analysis to whether exercising jurisdiction over Defendant comports with the Due Process Clause.").

Nissan's mistakenly relies on *Heritage House Restaurants, Inc. v. Cont'l Funding Group, Inc.*, 906 F.2d 276 (7th Cir. 1990), for the proposition that "[e]ach cause of action alleged must independently arise from one of the enumerated acts" in the long-arm statute, (Doc. 51 at 16–17). *Heritage House*, and the case it relies on, *Club Assistance Program, Inc. v. Zukerman*, 594 F. Supp. 341, 345 (N.D. Ill. 1984), are premised on an outdated 1987 version of the Illinois long-arm statute that did not extend jurisdiction to the limits of Due Process. *Heritage House*, 906 F.2d at 279 n.4; *Club Assistance Program*, 594 F. Supp. at 344; *see generally* Ill. Rev. Stat. ch. 110, ¶ 2–209 (1988).[2] The current subsection (c)—the provision extending long-arm jurisdiction to the limits of Due Process—was added by the Illinois legislature in September of 1989. *Autotech Controls Corp. v. K.J. Elec. Corp.*, 628 N.E.2d 990, 993 (Ill. App. Ct. 1993); *see also Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 714 (7th Cir. 2002) ("Some long-arm statutes contain a list of permitted grounds of jurisdiction, into which a particular case must fit, while other long-arm statutes simply authorize the state courts to assert personal jurisdiction on any basis not forbidden by the due process clause of the Fourteenth Amendment. Until 1988, Illinois's statute was of the former type. In 1988, however, the law was amended to add a new subsection (c) . . . ."). Nissan's argument, therefore, is utterly unavailing.

### 2. Plaintiff DeMaria Adequately Alleges Specific Personal Jurisdiction and the Court May Exercise Pendent Personal Jurisdiction Over the Remaining Claims

"There are two types of personal jurisdiction: general jurisdiction, which exists only

---

[2] This historical version of the statute is attached as **Exhibit 1**.

when the party's affiliations with Illinois 'are so constant and pervasive as to render [it] essentially at home' [in Illinois]; and specific jurisdiction, which is 'case-specific' and exists where the plaintiff's claim is 'linked to the [defendant's] activities or contacts with" Illinois. *Indus. Models, Inc. v. SNF, Inc.*, No. 14 C 8340, 2015 WL 2399089, at \*2–3 (N.D. Ill. May 18, 2015) (citations omitted) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014) and *Kipp v. Ski Enter. Corp. of Wisconsin, Inc.*, 783 F.3d 695, 698 (7th Cir. 2015)). For specific personal jurisdiction to attach "the suit must 'arise out of' or 'be related to' [the defendant's] minimum contacts with the forum state." *Hyatt Intern. Corp.*, 302 F.3d at 716–17. As this Court recently explained, "Defendant's contacts must satisfy at least three requirements to be relevant: (1) the contacts are created by the defendant himself; (2) the contacts are targeted at the forum state (as opposed to persons who reside there); and (3) the contacts bear on the substantive legal dispute." *United Airlines, Inc.*, 2015 WL 2011720, at \*4.

The FAC alleges that Plaintiff DeMaria is an Illinois citizen, that DeMaria purchased her Nissan Altima in Illinois, that she requested repairs by a Nissan dealership in Illinois, that the Nissan dealership refused to repair her vehicle in Illinois, and that she incurred damages in Illinois. FAC ¶¶ 4, 46–49. DeMaria's cause of action arises out of Nissan's purposeful contacts with Illinois. Nissan sold the vehicle in Illinois, thus creating contacts with Illinois and targeting those contacts at Illinois, Nissan further refused to cover the cost of the requested repairs, resulting in the substantive legal dispute at issue here. FAC ¶ 46–49. Nissan concedes, as it must, that Plaintiffs have adequately alleged specific personal jurisdiction as to Plaintiff DeMaria's claims. Doc. 51 at 18. That concession is dispositive here.

All Plaintiffs' remaining claims arise out a common nucleus of operative facts with

DeMaria's claim. The crux of this matter is whether Class Vehicles were sold with a defect that makes their floorboards prone to severe rust and corrosion; when Nissan became aware of that defect; and whether Plaintiffs and Class members are entitled to relief as a result. Whether a plaintiff purchased a vehicle from a dealership in Indiana, Illinois, or elsewhere, the common nucleus of operative facts regarding the defective nature of the floorboards and Nissan's corporate knowledge, is the same. That being the case, application of pendent personal jurisdiction is appropriate here.

"Under the doctrine of pendant [sic] personal jurisdiction, a court may hear claims as to which personal jurisdiction is lacking if those claims arise out of a common nucleus of operative fact with claims as to which personal jurisdiction exists." *C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd.*, 626 F. Supp. 2d 837, 844 n.2 (N.D. Ill. 2009) (quoting *Arkansas Blue Cross and Blue Shield v. Philip Morris, Inc.*, No. 98 C 2612, 1999 WL 202928, *2 (N.D. Ill. Mar. 31, 1999)); *see also Tucker v. Bank One, N.A.*, 265 F. Supp. 2d 923, 925 (N.D. Ill. 2003) ("Due to the nationwide service provision of RICO, 18 U.S.C. § 1965(b), this court may exercise personal jurisdiction over all of the defendants on the RICO count. This court's exercise of personal jurisdiction over all the defendants on the remaining claims, which arise out of the same series of events as the RICO claim, is justified under the doctrine of supplemental personal jurisdiction."); *Banwell v. Illinois Coll. of Optometry*, 981 F. Supp. 1137, 1141 n.4 (N.D. Ill. 1997); *Miller Pipeline Corp. v. British Gas plc*, 901 F. Supp. 1416, 1423–24 (S.D. Ind. 1995) ("The doctrine of pendent jurisdiction applies to personal as well as subject matter jurisdiction, and to federal as well as state claims."). The Seventh Circuit embraced pendent personal jurisdiction in *Robinson Eng'g Co. Pension Plan & Trust v. George*, 223 F.3d 445 (7th Cir. 2000), stating:

> Under the Federal Rules as they stood in 1988 it was unclear if
> the nationwide service provided for in a federal statute could be

> used to gain personal jurisdiction over the defendant for a state
> law claim as well. In our view, the same logic that lies behind
> the supplemental jurisdiction statute for purposes of subject
> matter jurisdiction, 28 U.S.C. § 1367, supports the application
> of supplemental personal jurisdiction over claims that are
> properly before the court under § 1367.

*Id.* at 449–50 (citations omitted).

Nissan concedes that specific personal jurisdiction as to DeMaria's claims is proper. Accordingly, because the claims of the remaining plaintiffs arise out of a common nucleus of operative facts, the Court may exercise supplemental personal jurisdiction over Plaintiffs' remaining claims as well.

### 3. Absent Pendent Personal Jurisdiction, Nissan's Contacts are Sufficiently "Related to" the Remaining Claims to Justify Personal Jurisdiction

Specific personal jurisdiction is proper where the suit is "related to" the defendant's contacts with the forum state. Nissan's conduct here, relating to non-Illinois Plaintiffs, is sufficiently "related to" its contacts with Illinois to independently support specific personal jurisdiction.

For example, in *Terry v. TMX Fin. LLC*, No. 13 C 6156, 2014 WL 2066713 (N.D. Ill. May 19, 2014), plaintiff brought a putative class action alleging violations of the overtime provisions of the Fair Labor Standards Act. *Id*. at *1. While the complaint was pending, several plaintiffs from other states opted into the suit. *Id.* Just as Nissan argues here, the defendant in that case asserted that the court lacked specific personal jurisdiction over the non-Illinois conduct and claims. The court disagreed, stating:

> In this case, it is alleged that [defendant] engaged in a
> nationwide practice of underpaying its GMITs [General
> Manager in Training], with resulting injuries suffered in a
> several other states. Because the alleged misconduct is the
> same whether it occurred in Illinois or Alabama, the injuries
> sustained outside Illinois "relate to" the injuries sustained
> within Illinois. Thus, the Court's jurisdiction covers the full

scope of [defendant's] allegedly nationwide practice.

*Id.* (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, (1984)). Similarly, in *Hyatt*, the Seventh Circuit determined that the defendant's relevant "related to" contacts included "the parties' entire course of conduct" with respect to the whole failed business transaction in dispute, not just the contacts related to one potential contractual manifestation of that broader business deal as defendant had suggested. *Hyatt Intern. Corp.*, 302 F.3d at 716–17.

Nissan's conduct regarding non-Illinois Plaintiffs is identical to its behavior regarding DeMaria in Illinois. Accordingly, "the alleged misconduct is the same whether it occurred in Illinois or Alabama, the injuries sustained outside Illinois 'relate to' the injuries sustained within Illinois," and asserting personal jurisdiction over Nissan's nationwide practice is proper. *Terry*, 2014 WL 2066713, at *1.

### 4. Personal Jurisdiction Is Fundamentally Fair and Promotes Efficiency

Personal jurisdiction "analysis is not 'mechanical or quantitative,'" rather, "[t]he ultimate question is 'whether it is fundamentally fair to require the defendant to submit to the jurisdiction of the court *with respect to this litigation*.'" *Johnson v. Creighton Univ.*, No. 14 C 4622, 2015 WL 4247781, at *4 (N.D. Ill. July 14, 2015) (emphasis in original) (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 319 (1945); *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 780 (7th Cir. 2003)). Accordingly, where, "minimum contacts have been established, [defendant] can only escape jurisdiction by making a 'compelling case' that forcing it to litigate in [Illinois] would violate traditional notions of fair play and substantial justice." *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996).

After the Court determines that the "connection between the forum and the episode-in-suit could justify the exercise of specific jurisdiction," then, "in a second step, the court is

to consider several additional factors to assess the reasonableness of entertaining the case."
*Daimler AG v. Bauman*, 134 S. Ct. 746, 762 n.20 (2014). Those factors include (1) the
burden on the defendant; (2) the interests of the forum State; (3) the plaintiff's interest in
obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient
resolution of controversies; and (5) the shared interest of the several States in furthering
fundamental substantive social policies. *Asahi Metal Indus. Co. v. Superior Court of
California, Solano Cnty.*, 480 U.S. 102, 113 (1987) (quoting *World-Wide Volkswagen Corp.
v. Woodson*, 444 U.S. 286, 292 (1980)).

Implausibly, Nissan argues that the burden on it and the judiciary—factors one and
four—would be *lessened* by litigating these cases "in at least 16 and as many as 49 states."
Doc. 51 at 21. Litigating identical actions, save for the name and location of the plaintiff, in
every state in the union would increase by orders of magnitude the burden on Nissan and the
courts, and is the most inefficient judicial mechanism conceivable for resolution of this
controversy. Nissan conceded that personal jurisdiction in Illinois is proper as to DeMaria's
claim; it will be litigating in this forum in any event. The additional burden on Nissan from
litigating the other Plaintiffs' claims in this forum is marginal compared to litigating multiple
cases across numerous other states. To the extent Nissan is suggesting manageability
concerns under Rule 23 of the Federal Rules of Civil Procedure are implicated here via its
citation to *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002), such
considerations are inappropriate in the context of personal jurisdiction. Whether a
nationwide class is certifiable under Rule 23 is irrelevant to whether personal jurisdiction is
properly alleged.

Moreover, non-Illinois Plaintiffs have a significant interest in obtaining relief in this
forum, in the context of this case: a putative nationwide class. As with any nationwide class,

the remaining Plaintiffs potentially could obtain relief individually in their home states. However, the various reasons alleged in the FAC regarding why class treatment is superior, FAC ¶ 133, establish the non-Illinois Plaintiffs' interest in litigating in this particular forum. Nissan's questionable logic completely undercuts the very purpose of class actions and Rule 23—the economy and efficiency gained by a litigating in a single, centralized forum. According to Nissan, the availability of relief in any other forum would *de facto* prevent the maintenance of a class on the grounds of personal jurisdiction. Indeed, Nissan's personal jurisdiction arguments, taken to their logical conclusion, would preclude putative nationwide class action cases from ever being brought in any jurisdiction other than those capable of asserting general personal jurisdiction: *i.e.* in the defendant's principle place of business and state of incorporation. Thus, under Nissan's theory, defendants in nationwide class cases must—as matter of constitutional Due Process—always enjoy home field advantage. Nissan cites no authority to support that sweeping result.

Ultimately, requiring Nissan to litigate before this Court is fundamentally fair. Nissan is going to litigate DeMaria's claims in this forum. It has nearly forty dealerships in the state of Illinois alone.[3] It sold nearly 1.4 million vehicles in the United States last year.[4] Nissan's parent company, Nissan Motor Co., Ltd., has more than 247,500 employees and had nearly $104 billion in revenue in fiscal year 2014.[5] The only fundamentally *unfair* outcome here would be forcing the remaining Plaintiffs to individually litigate each claim in their home forum; creating needlessly duplicative (and potentially inconsistent) litigation throughout the

---

[3] *See* Nissan, *Choose Your State* (last visited Sept. 18, 2015),
http://www.nissanusa.com/nissandealers/location/illinois?language=en.

[4] *See* Nissan, *Nissan Group Reports March 2015 and 2014 Fiscal Year Total Sales* (Apr. 1, 2015), http://nissannews.com/en-US/nissan/usa/channels/U-S-Sales-Reports/releases/nissan-group-reports-march-2015-and-2014-fiscal-year-total-sales ("For the company's 2014 fiscal year, Nissan set an all-time record with 1,399,557 total U.S. sales, an increase of 8.9 percent over its 2013 fiscal year." ).

[5] Nissan, *Corporate Info* (last visited Sept. 18, 2015), http://www.nissanusa.com/about/corporate-info.

13

country.

To the extent the Court might remain concerned that personal jurisdiction has not been sufficiently established, Plaintiffs request time to conduct jurisdictional discovery. While Plaintiffs concede that the FAC does not allege sufficient factual material to establish general personal jurisdiction under *Daimler*, discovery may reveal the basis for such allegations.

### B. Plaintiffs Have Adequately Alleged that Nissan Knew of the Floorboard Defect.

#### 1. Knowledge May Be Alleged Generally Under Rule 9(b)

Nissan asks the Court to dismiss Plaintiffs' common-law fraud and each of its state consumer protection claims pursuant to Rule 9(b). It contends that Plaintiffs must describe with particularity exactly what Nissan knew internally about the defect—including what specific anticorrosion tests Nissan conducted on its floorboards prior to release, the precise results of that testing, and the exact percentage of corrosion-related warranty claims. Doc. 51 at 23–28. Rule 9(b) does require that fraud claims be alleged "with particularity," but the Rule also specifies that "knowledge, and other conditions of a person's mind may be alleged generally." Plaintiffs have fulfilled that requirement, alleging generally that Nissan knew of the floorboard defect since 2001, both as a result of its production experience and its pre-release materials testing. FAC ¶ 36.

Although Nissan is moving to dismiss consumer protection claims from 16 different states, Nissan draws predominantly on law from just California and New Jersey—states that have sometimes required detailed allegations of knowledge despite Rule 9(b)'s permissive pleading standard. The case law Nissan cites from California is driven, at least in part, by an element unique to California consumer protection law—namely, the requirement that a defendant manufacturer have "exclusive knowledge" of the undisclosed facts at issue. *See*

*Burdt v. Whirlpool Corp.*, No. C 15-01563, 2015 WL 4647929, at *3 (N.D. Cal. Aug. 5, 2015); *Williams v. Yamaha Motor Corp., U.S.A.*, No. CV 13-05066, 2015 WL 2375906, at *4, n.9 (C.D. Cal. Apr. 29, 2015). The degree of specificity necessary to establish exclusive knowledge under California consumer protection law remains an open question, however, with some courts finding fairly generalized allegations about the source of defendant's knowledge to be sufficient. *See, e.g.*, *Elias v. Hewlett-Packard Co.*, No. 12-CV-00421, 2014 WL 493034, at *7 (N.D. Cal. Feb. 5, 2014) ("[T]hese allegations go to HP's knowledge of the defect … and therefore need only be alleged generally." (quotations omitted)); *see also Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 998 (N.D. Cal. 2013). In any event, this case does not include any California claims and so case law interpreting the degree of specificity necessary to state a claim under California substantive law is of little assistance.

One plaintiff does assert claims under New Jersey consumer protection law. That statute also has been held to require more than simple knowledge of an undisclosed fact— some courts have required knowledge "with certainty." *See*, *e.g.*, *Mickens v. Ford Motor Co.*, No. 10-CV-5842, 2015 WL 5310755, at *8 (D.N.J. Sept. 10, 2015). As with California, however, the requirement that knowledge be alleged with specificity is not universally applied. For example, one of the cases that Nissan cites ultimately allowed the plaintiffs' New Jersey consumer claims to proceed based only on an "information and belief" allegation that BMW knew that its tires would fail:

> BMW argues that Greene has not stated an NJCFA claim because his "information and belief" allegation does not satisfy the plausibility pleading requirements of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). This argument fails. As the Second Circuit has recognized, "[t]he *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are

15

> peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotations and citations omitted).

*Greene v. BMW of N. Am.*, No. 2:11-04220, 2014 WL 47940, at *3 (D. N.J. Jan. 7, 2014).

Even if the California and New Jersey cases Nissan cites reflect a different view of Rule 9(b)—rather than substantive differences of those states' consumer protection laws—those decisions would not control. When faced with a conflict in federal procedural law, courts generally apply the law of the forum. *See* Restatement (Second) of Conflict of Laws § 127 (1971) ("The local law of the forum governs rules of pleading"); *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 957 (C.D. Cal. 2012) (applying local law regarding Rule 9(b)'s applicability to Florida consumer protection law).

As this Court confirmed in *Coss v. Playtex Products*, No. 08 C 50222, 2009 WL 2245657, at *5 (N.D. Ill. July 10, 2009), the law of *this* jurisdiction is that "[u]nder Rule 9(b), knowledge can be pled generally." Courts outside this district mostly concur: when not considering California or New Jersey consumer fraud claims, other courts faced with global requests to dismiss various consumer protection claims have concluded that general allegations of knowledge are sufficient. For example, in *In re Porsche Cars North America, Inc.*, 880 F. Supp. 2d 801, 817 (S.D. Ohio 2012), the court concluded that rather basic knowledge allegations—including that Porsche "knew or should have known of the defect due to the mechanics of the design and pre-release testing data"—were sufficient to establish Porsche's knowledge at the pleading stage. Like Nissan, Porsche had argued that the plaintiffs had failed to provide specifics, but the court cited to Rule 9(b)'s provision that knowledge may be alleged generally, and reasoned that further details "are likely within [Porsche's] control and are best addressed after the close of discovery." *Id.*; *see also Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 547 (D. Md. 2011) (denying global request to dismiss

16

consumer claims based in part on the fact "Plaintiffs have alleged that Ford knew of the defect prior to selling the vehicles"); *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009) (finding general allegations that Whirlpool knew of defects but failed to disclose them sufficient under Rule 9(b)).

## 2. Plaintiffs' Knowledge Allegations Are Plausible

Though couched in terms of the procedural requirements of Rule 9(b), Nissan's argument essentially attacks the merits of Plaintiffs' case, but before any discovery has been taken or expert reports submitted. Nissan argues it could not have known of a problem that takes years to visibly manifest, such that Plaintiffs' allegations that Nissan knew of the defect through pre-release testing are illogical. But precisely what Nissan knew, and when Nissan knew it, are questions "best addressed after close of discovery." *In re Porsche Cars*, 880 F. Supp. 2d at 817. After discovery is conducted, experts can explain exactly how Nissan conducted laboratory tests to simulate years of exposure to the elements. *Id.; see also Arnett*, 658 F.3d at 752 (stating that a complaint need allege only enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations). Experts can likewise explain standard statistical techniques used to extrapolate field and warranty data to warn of future problems. Although it will not be obvious to an average driver that, hidden under a Class Vehicle's carpet, the floorboard is rusting rapidly and will lead to a sizeable hole in the bottom of the vehicle, a rapid level of oxidation is something that automotive companies learn of through standard materials testing.

Nissan laments the lack of detailed allegations about the particular pre-sale testing methodologies that it employed and what precisely those tests revealed. Doc. 51 at 24. But those types of details are rarely if ever available at the pleading stage—the information is proprietary and in Nissan's exclusive control. And the Seventh Circuit recognizes that a

17

plaintiff's "pleading burden should be commensurate with the amount of information available to them." *Runnion ex rel. Runnion*, 786 F.3d at 528.

In addition, the FAC includes a number of facts that lead to the reasonable inference that Nissan realized the likelihood for severe corrosion from the beginning: Several corrosion prevention techniques have been standard in the industry for many years (including the use of corrosion-resistant materials, coated steels, sealers, and polymers). FAC ¶ 34. In conjunction with those techniques, it has long been standard in the industry to perform presale tests to assess floorboards' tendency to corrode. FAC ¶ 35. These tests can measure, among other things, moisture dissipation and alloy changes, and can evaluate both the selected mechanism of corrosion protection and the completed assembly. *Id*. This combination of corrosion prevention techniques and presale testing has become ubiquitous in the industry and, at least before the sale of Class Vehicles, both Nissan and its competitors unerringly produced vehicles that do not develop large floorboard holes. FAC ¶¶ 32–34. Yet with all that knowledge and testing at its disposal, Plaintiffs allege Nissan chose to switch to using a new steel sheet in Class Vehicles highly prone to extremely severe corrosion. FAC ¶¶ 32–39. Such allegations readily satisfy Plaintiffs burden as articulated in *Runnion*, and the inference that Nissan chose to cut costs through some combination of lesser materials and fewer corrosion protection techniques, and then ignored presale test, should be sustained at the pleading stage and then tested through discovery and expert analysis at the merits stage.

Finally, it must be noted that several of the named Plaintiffs bought their vehicles in just the last few years, more than a decade after Nissan made a switch in the steel sheet in the body of Class Vehicles. Two Plaintiffs bought their vehicles last year and others bought theirs in 2010 and 2011. FAC ¶¶ 46, 57, 66, 113, 116. No argument justifies dismissing

18

those Plaintiffs' claims on lack of knowledge grounds. Over the past fourteen years—including the seven-year span during which it was selling these vehicles new—Nissan actively monitored various sources of data for potential safety defects. Plaintiffs have alleged that it is implausible and inconsistent with the facts that Nissan could have remained unaware of such a serious defect in its most popular models, for so long. *E.g.*, FAC ¶¶ 1, 27, 36–38 (alleging that not only did Nissan receive warranty data, but unlike in other cases, Nissan had a special warranty devoted specifically to corrosion problems, so there would be no need to actively sift through the incoming warranty claims); *id.* (alleging that driver complaints related to floorboard corrosion have been particularly ardent—and thus more likely to be noticed by Nissan).

### 3. The Alleged Safety Risks Are Plausible

Citing no applicable authority, Nissan asserts that Plaintiffs' allegations do not articulate a "plausible" safety risk. But the FAC specifically articulates how the defective floorboards may constitute a safety risk by:

- compromising the integrity of the vehicle's structure, and presenting particular danger in the event of collision, FAC ¶ 32;

- allowing debris from the roadway to enter the vehicle, *id*. ¶ 30; and

- allowing exhaust and other fumes to enter the cabin, FAC ¶ 32.

Indeed, the existence of a significant hole or compromised piece of metal under the driver's feet—the same location where the driver is applying pressure to the gas and brake pedals of the vehicle—is an obvious safety risk.

Courts do not apply a standard definition of what constitutes a "safety" risk, but generally agree that it must be a concern that "a reasonable consumer would find material." *Mui Ho*, 931 F. Supp. 2d at 997; *In re Porsche Cars*, 880 F. Supp. 2d at 833–35, 839–42,

848–50, 859–62 (declining to dismiss claims under several deceptive trade practices statutes where plaintiffs alleged facts regarding a defect's safety risk and the failure to disclose material information to consumers). Whether a safety hazard is unreasonable or material— is a question of fact for the jury. *Blaue v. Kissinger*, No. 03 C 9025, 2006 WL 2092380, *9 n.6 (N.D. Ill. July 24, 2006) ("[T]he question of whether a defendant's product is unreasonably dangerous for failure to incorporate certain safety devices is generally a question to be decided by a jury."); *Philips v. Ford Motor Company*, No. 14-CV-02989, 2015 WL 4111448, *11 (N.D. Cal. July 7, 2015) (denying a motion to dismiss because the issue of whether the defect was a material safety hazard was reserved for the jury); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 957 (N.D. Cal. 2014) (denying a motion to dismiss and finding that materiality of a defect is "generally a question of fact") (internal quotation omitted).

To determine if it is plausible whether a reasonable consumer would consider the defect in Class Vehicles to be a serious safety risk, the Court need only review the allegations of first hand complaints from drivers set forth in the FAC.

- "It's an obvious safety issue with a giant hole in the floor that exhaust fumes can enter . . ." FAC ¶ 41; NHTSA ID Number 10281316;

- "These holes may alter the structural integrity of the body frame in case of side impact." FAC ¶ 41; NHTSA ID Number 10281326;

- "I believe this is a very dangerous problem that should be corrected by Nissan as a recall safety issue." FAC ¶ 41; NHTSA ID Number 1066860;

- "[T]his is extremely dangerous as it is possible for fumes or road debris to come through the carpet and into the passenger compartment . . . . [T]here should be some

sort of safety notice to current owners to make them aware of this problem." FAC ¶ 41; NHTSA ID Number 10535619;

- "This problem is an immense safety hazard. I was told i [sic] might be able to drive my car safely for another month or two before I risk my seat falling forward with me if I brake too suddenly." FAC ¶ 41; NHTSA ID Number 10731852; and

- "This is a safety hazard and should be addressed immediately by Nissan." FAC ¶ 42.

Given that a wide variety of consumers independently identified the defective floorboards as a serious safety concern, it is certainly plausible that a reasonable jury may agree and find that the defect is material and the floorboards are unreasonably dangerous.[6] Their conclusion, moreover, is backed by the several states that do not allow vehicles with floorboard degradation to pass state-mandated safety inspections. FAC ¶¶ 102, 123.

At the pleading stage, these allegations are sufficient, and Nissan's factual disagreement with the allegations do not obviate the Court's obligation to "tak[e] all facts alleged in the Complaint as true." *In re Porsche Cars*, 880 F. Supp. 2d at 826–27 (refusing to consider a defendant's fact-based arguments concerning an alleged defect at the motion to dismiss stage). The Court should reject Nissan's arguments.

### C. Nissan Had a Duty to Disclose the Defect.

#### 1. Nissan Must Disclose Safety Defects

Although various states' consumer protection statutes require only generally that consumers be told about any important information before entering into transactions, perhaps the most common application is to require the disclosure of any defect that poses a safety hazard. *In re MyFord Touch*, 46 F. Supp. 3d at 958–59; *Connick v. Suzuki Motors*

---

[6] Without citing a single case, Nissan contends that the defective floorboards are not a safety risk because Plaintiffs do not allege physical injuries arising from the defect. Doc. 51 at 25. Courts have rejected this argument and found that a safety risk may exist even in the absence of physical injuries. *In re Porsche Cars*, 880 F. Supp. 2d at 827–28 (collecting and discussing cases).

21

*Co., Ltd.*, 675 N.E.2d 584, 595 (Ill. 1996); *Philips*, 2015 WL 4111448, *10–11; *In re Porsche Cars*, 880 F. Supp. 2d at 826–27 (considering the laws of several states).  As set forth above, Plaintiffs allege the defect presents a serious safety risks for consumers—an allegation consistent with other cases that have identified other defects as constituting "safety" concerns triggering a duty to disclose.  *See In re MyFord Touch*, 46 F. Supp. 3d at 959–60 (denying a motion to dismiss where the safety risk was a defective defroster and rearview camera); *Mui Ho*, 931 F. Supp. 2d at 997–98 (denying a motion to dismiss where the safety risk was the accumulation of water in the vehicle's headlamps); *In re Porsche Cars*, 880 F. Supp. 2d at 801 (denying a motion to dismiss where the safety risk was associated with the vehicle's cooling system); *Philips*, 2015 WL 4111448, *11–12 (denying a motion to dismiss where the safety risk was associated with the vehicle's power assisted steering).[7]

Nissan cites several cases for the proposition that manufacturers are not obligated to disclose post-warranty defects, Doc. 51 at 23–24, but to the extent some states have adopted that reasoning, they have also held that safety defects are an exception to that general rule. *See Smith v. Ford Motor Corp.*, 749 F. Supp. 2d 980, 987–88 (N.D. Cal. 2010) ("A manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation *or a safety issue*." (citation omitted, emphasis added)); *see also Mui Ho*, 931 F. Supp. 2d at 996 (same).  Thus, Nissan's cases are inapposite.

### 2.  Plaintiffs' Claims Are Pled With Particularity

Missing the crux of Plaintiffs' allegations, Nissan argues that Plaintiffs did not plead their claims with the requisite particularity.  Plaintiffs' claims are rooted primarily in

---

[7] Nissan's cited case, *Daugherty v. Am. Honda Motor Co.*, also recognized the exception that a manufacturer is under a duty to disclose a safety defect. 51 Cal. Rptr.3d 118, 126 (2006). However, the "defect" in *Daugherty* was an oil seal that the Court found did not present any safety risk to consumers.  The Defect alleged in this case constitutes a multi-faceted safety risk.

Nissan's concealment and/or omission of material facts. Indeed, Plaintiffs do not pursue an outright fraud claim; instead, they aver fraudulent concealment (Count Three), and concealment/omission claims under the various consumer protection laws in the identified states. Therefore these claims "can succeed without the same level of specificity required by a normal fraud claim. This is because a plaintiff alleging an omission-based fraud will not be able to specify the time, place, and specific content of an omission as would a plaintiff in a false representation claim." *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014) (collecting cases) (internal quotations omitted). Indeed, "[b]ecause the plaintiffs are alleging a failure to act instead of an affirmative act, [they] cannot point out the specific moment when the Defendant failed to act." *Id.* In *MacDonald*, the court denied the manufacturer's motion to dismiss because the plaintiffs' claims were based on the company's omission of information concerning the vehicle defect. The court found that the plaintiff "adequately allege[d] the who what when and how given the inherent limitations of an omission claim." *Id.* The court stated that the plaintiff adequately pleaded "the who is Ford, the what is its knowledge of the defect, the when is prior to the sale of Class Vehicles, and the where is the various channels of information through which Ford sold Class Vehicles." *Id.* (internal quotations omitted); *see also Philips*, 2015 WL 4111448, *12 (finding that omission claims satisfy the particularity requirements); *Velasco*, 2014 WL 4187796, *4–5 (same).

Plaintiffs in this case have alleged that Nissan concealed and omitted material facts, and Plaintiffs' claims satisfy the particularity standards of Rule 9(b).[8] This is particularly true where "Rule 9(b) may be relaxed when there has been virtually no discovery and the

---

[8] Nissan argues that Plaintiffs have improperly "lumped" together Nissan North America, Inc. and Nissan Motor Company, Ltd. in its pleading. Nissan cites *Sears v. Likens*, 912 F.2d 889 (7th Cir. 1990) to support its proposition, but that case dealt only with affirmative misrepresentations—misrepresentations that inherently require a plaintiff to identify the party making the representation. Again, Nissan misconstrues Plaintiffs' assertions regarding Nissan's concealment and/or omissions.

information needed for a plaintiff to prove particularity is held exclusively by the opposing party. The purpose behind Rule 9(b) is to provide Nissan with notice of Plaintiff's claim so that it may prepare an informed responsive pleading." *In re Porsche Cars*, 880 F. Supp. 2d at 815 (citing *Michaels Bldg. Co. v. Ameritrust, Co., N.A.*, 848 F.2d 674, 680 n.9 (6th Cir. 1988) and *Coffey v. Foamex, L.P.*, 2 F.3d 157, 162 (6th Cir. 1993)). Indeed, "courts have relaxed [Rule 9(b)] when factual information is peculiarly within the defendant's knowledge or control." *In re Caterpillar, Inc., C13 and C15 Engine Products Liability Litigation*, MDL No. 2540, 2015 WL 4591236 (D.N.J. July 29, 2015) (quoting *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)). Where a defendant has superior knowledge, "a court cannot reasonably expect highly specific allegations before allowing at least a brief discovery period. The facts that would have to be alleged are known to the defendants, but the plaintiffs have not yet had a chance to find them out." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001) (denying a motion to dismiss where the plaintiff had not yet "had the benefit of discovery"); *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) (relaxing the Rule 9(b) standard where the plaintiff "lacks access to all facts necessary to detail his claim . . .") (internal citations omitted); *see also Gunderson v. ADM Investor Services, Inc.*, 230 F.3d 1363, *3 (8th Cir. 2000) ("Plaintiffs have alleged more than the bare legal conclusion of agency. They need not plead fraud 'with complete insight before discovery is complete.'" (quoting *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998))).

Nissan's cited authorities do not dictate a different result because they all involve individual cases premised on *affirmative* misrepresentations—none were based on concealed and/or omitted information. The Court should reject Nissan's argument.

24

**D. Plaintiffs' implied-warranty-of-merchantability claim does not fail, because (1) Plaintiffs allege defects that exist at the point of sale, (2) any alleged warranty limitation has been tolled and/or is unconscionable, and (3) privity is not a bar.**

Nissan ignores the actual allegations of the FAC—focusing not on the Plaintiffs' allegations of the defect that exist *at the point of sale* of the Class Vehicles—but instead on Plaintiffs' later discovery of the rust. Doc. 51 at 27. Of course, Plaintiffs discovered rust and corrosion following delivery of their Class Vehicles, because they are the consequence of the defect and take time to become visible. FAC ¶ 2 ("The defect makes the Altima and Maxima floorboards prone to severe rust and corrosion . . . ."). But the fact that the corrosion can take time to eat its way through the entire floor panel, and then even more time to be discovered, does not change the existence of the defect at the time of sale. Each Class Vehicle was manufactured and sold with the same "inadequate floorboard corrosion protection," including "the [non-]use of corrosion-resistant materials, coated steels, sealers, and polymers." FAC ¶ 34. Contrary to Nissan's contention, the defect existed at the point of sale. FAC ¶ 33–36 (alleging how manufacturers can largely eliminate the risk of floorboard rust and corrosion but "Nissan opted to deviate from optimal corrosion prevention" techniques and sold and leased "new Class Vehicles with this defect").[9]

Nissan also ignores Plaintiffs' allegations related to safety, FAC ¶¶ 32, 41, which are particularly important when addressing merchantability claims in automobile cases. *See Nelson v. Nissan N. Am., Inc.,* 894 F. Supp. 2d 558, 567 (D.N.J. 2012) ("As applied to cars, 'the implied warranty of merchantability is simply a guarantee that they will operate in a *safe condition* and substantially free of defects [and, therefore,] where a car can provide *safe,*

---

[9] As Plaintiffs allege, the floorboards are not a "wear component" that they would expect to change or repair during the useful lives of the vehicles. FAC. ¶ 31. This is so regardless of Nissan's warranty regarding "rust"—rust or no rust, the floorboards of the vehicles should not *entirely corrode through* during the useful life of the vehicles.

25

reliable transportation[,] it is generally considered merchantable." (internal citations omitted, emphasis added)). Questions related to merchantability are best left to a jury when they involve latent[10] safety defects. *E.g.*, *In re MyFord Touch*, 46 F. Supp. 3d at 980 (addressing breach of implied warranty claims for plaintiffs in fifteen states, most of which had adopted UCC § 2-314, and stating, "it is a question of fact for the jury as to whether the problems with [a feature in the automobiles] posed enough of a safety risk that the cars at issue could not be said to provide safe, reliable transportation.").[11] The cases cited by Nissan are inapposite.[12]

Nissan also argues that no implied warranty could have lasted longer than three years (for rust) or five years (for rust perforation). Doc. 51 at 28. This argument completely

---

[10] The defect exists at the point of sale of the vehicles; however, Plaintiffs did not know, nor could they have reasonably known, about it until the floorboards failed. FAC ¶ 37.

[11] *See also Sater v. Chrysler Group LLC*, No. EDCV 14-00700-VAP, 2015 U.S. Dist. LEXIS 21022, at *24–26 (C.D. Cal. Feb. 20, 2015) (denying Chrysler's motion to dismiss to the extent it argues trucks with latent defects affecting steering are merchantable—despite plaintiffs being able to drive them for thousands of miles—because it is a question of fact better left for a jury); *Nelson*, 894 F. Supp. 2d at 567 (finding sufficient claims for breach of the implied warranty of merchantability where plaintiffs alleged they began experiencing transmission problems in certain Nissan Maxima and Altima vehicles); *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1243–44 (C.D. Cal. 2011) (emphasizing potential safety risks of allegedly defective steering assembly and denying defendant's motion to dismiss an implied warranty of merchantability claim under California law); *Hornberger v. General Motors Corp.*, 929 F. Supp. 884, 888 (E.D. Pa. 1996) ("[A] material question of fact does exist as to whether a normal transmission of a newly leased vehicle would fail after being driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and, therefore, unmerchantable.")

[12] Nissan discusses several cases in connection with its motion. Doc. 51 at 28. Neither *Priebe v. Autobarn, Ltd.*, 240 F.3d 584 (7th Cir. 2001), nor *Indiana Nat'l Bank of Indianapolis v. De Laval Separator Co.*, 389 F.2d 674 (7th Cir. 1968), were decided at the motion to dismiss stage. The court in *Stevenson v. Mazda Motor of Am., Inc.*, No. 14-5250 (FLW)(DEA), 2015 U.S. Dist. LEXIS 70945 (D.N.J. June 2, 2015), discussed the fitness of plaintiff's vehicle in terms of "providing transportation," not safety, and it emphasized the limitation period of the vehicle warranty in dismissing the implied warranty claim. *In re Nissan Radiator*, No. 10 CV 7493 (VB), 2013 U.S. Dist. LEXIS 116720 (S.D.N.Y. May 30, 2013), made no merchantability finding as a matter of law as Nissan claims—the opinion resulted from a joint motion certifying a settlement class and approving a final settlement agreement. Finally, in *Sheris v. Nissan North America, Inc.*, No. 07-2516 (WHW), 2008 U.S. Dist. LEXIS 43664 (D.N.J. June 2, 2008), the plaintiff failed to allege what made his vehicle unmerchantable or unsafe for driving.

disregards Plaintiffs' allegations concerning tolling. FAC ¶ 135.[13] Moreover, Plaintiffs have alleged more than sufficient facts to make a *prima facie* showing that Nissan's implied warranty limitation is unconscionable. Nissan had exclusive and superior knowledge of the defect from the time it first sold and leased Class Vehicles. FAC ¶¶ 36, 45. Nonetheless, Nissan concealed the defect from consumers who had no reasonable way to discover it before obtaining their Class Vehicles. FAC ¶ 45. Under similar allegations, courts frequently deny motions to dismiss by finding that limitations in a warranty can be unconscionable.[14]

Nissan contends that Plaintiffs' merchantability claims in several states fail for lack of privity. Doc. 51 at 38–39. Nissan is wrong.[15] *Lake v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 911 (N.D. Ill. 2013) (discussing how a plaintiff "is excepted from the privity requirement in both Illinois and Alabama" where a plaintiff sues for personal injuries and declining to dismiss plaintiffs' claim for breach of implied warranty); *Naiser v. Unilever*

---

[13] *Sater*, 2015 U.S. Dist. LEXIS 21022, at *23 (denying Chrysler's motion to dismiss the implied warranty claim, because it "was tolled until [plaintiff] had reason to learn of the defects in his Truck," which were alleged to have been fraudulently concealed); *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 536 (D. Md. 2011) (finding plaintiffs have adequately alleged tolling "when Ford fraudulently concealed the torque converter defect, and thus these plaintiffs' implied warranty claims are not time barred and should not be dismissed at this point.").

[14] *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 296 (4th Cir. 1989) (finding plaintiff's allegations of General Motors' superior knowledge of a defect sufficient to survive motion to dismiss stage by concluding that the limitations in a warranty period could be unconscionable); *In re Porsche Cars*, 880 F. Supp. 2d at 821–23 (finding plaintiffs made a showing of unconscionability sufficient to allow their claims to proceed past a motion to dismiss); *Henderson v. Volvo Cars N. Am. LLC*, No. 09-4146, 2010 U.S. Dist. LEXIS 73624, at *26, n.6 (D.N.J. July 21, 2010) (finding that the plaintiff's allegations supporting a disparity in bargaining power between the parties was sufficient to support a finding of unconscionability at the motion to dismiss stage); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, No. 03-4558 (HAA), MDL 1687, 2008 U.S. Dist. LEXIS 73690, at *62–63 (D.N.J. 2008) (addressing Ford's argument regarding durational limitations on the implied warranty of merchantability and denying the motion to dismiss because "this Court cannot make this determination at the motion to dismiss stage."); *Russian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 621–23 (M.D.N.C. 2005), *adopted at* 411 F. Supp. 2d 614 (M.D.N.C. 2006) (denying motion to dismiss based upon unconscionability argument).

[15] As to Plaintiffs' implied warranty claim in Ohio, authority also exists for allowing the case to proceed past the motion to dismiss stage despite a lack of privity. *See Lewis v. Vin Devers Mercury, Inc.*, 111 Ohio App. 455, 457 (1959); *Rogers v. Toni Home Permanent Co.*, 167 Ohio St. 244, 256 (1958).

*United States, Inc.*, 975 F. Supp. 2d 727, 738–40 (W.D. Ky. 2013) (denying a motion to dismiss a warranty claim under Kentucky law despite a lack of direct privity with the manufacturer because plaintiffs sufficiently pleaded that defendant made direct representations to consumers); *Pack v. Damon Corp.*, No. 04-2163, 2006 U.S. App. LEXIS 2303, at *19–26 (6th Cir. Mich. 2006) (discussing Michigan law and concluding it has abandoned the privity requirement for implied-warranty claims); *Doll*, 814 F. Supp. 2d at 540–41 (denying Ford's motion to dismiss the implied warranty claims for lack of privity, because plaintiffs triggered the "thing of danger" exception under New York law).

### E. The economic loss doctrine does not preclude Plaintiff Corbin's negligence claim under Maryland law.[16]

The economic loss doctrine does not always bar recovery in tort if a defect creates a substantial and unreasonable risk of death or personal injury. *See, e.g.*, *Lloyd v. General Motors Corp.*, 916 A.2d 257, 265–71 (Md. 2007) (discussing such an exception in Maryland and reversing dismissal of a negligence claim related to an automobile defect). Here, Plaintiffs allege several safety risks associated with the defect. *See* Section B.3., *supra*. And Plaintiffs cite numerous complaints that have been submitted to the NHTSA and elsewhere regarding the nature and probability of serious injury associated with the defect. *Id.*; FAC ¶ 41–42. Plaintiff Corbin's negligence claim on behalf of herself and a Maryland State Consumer Class should not be barred by the economic loss doctrine.

---

[16] Plaintiffs agree to voluntarily dismiss the negligence claim on behalf of all Plaintiffs and the proposed Nationwide Class, except Plaintiff Roslyn Corbin on behalf of herself and the proposed Maryland State Consumer Class.

**IV.** <u>**Conclusion**</u>

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss.

Dated: September 28, 2015              Respectfully submitted,


By: <u>/s/ Edward A. Wallace</u>

Edward A. Wallace
Amy E. Keller
Adam Prom
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 346-2222 Telephone
eaw@wexlerwallace.com
aek@wexlerwallace.com
ap@wexlerwallace.com

*Proposed Interim Liaison Counsel*

John A. Yanchunis
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
(813) 223-5505 Telephone
jyanchunis@forthepeople.com

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
(816) 714-7101 Telephone
siegel@stuevesiegel.com

*Proposed Plaintiffs' Co-Lead Counsel*

Eric H. Gibbs
David Stein
**GIBBS LAW GROUP LLP**
One Kaiser Plaza, Suite 1125
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile:  (510) 350-9701
ehg@classlawgroup.com
ds@classlawgroup.com

29

Matthew Dameron
**WILLIAMS DIRKS DAMERON LLC**
1100 Main Street, Suite 2600
Kansas City, MO 64105
(816) 876-2600 Telephone
matt@williamsdirks.com

Gregory F. Coleman
**GREG COLEMAN LAW PC**
800 S. Gay Street
Suite 1100
Knoxville, TN 37929
(865) 522-0049 Telephone
greg@gregcolemanlaw.com
mark@gregcolemanlaw.com
lisa@gregcolemanlaw.com

Tim E. Dollar
Jeffrey J. Burns
**DOLLAR, BURNS & BECKER LLC**
1100 Main Street, Suite 2600
Kansas City, MO 64105
(816) 876-2600
timd@dollar-law.com

## CERTIFICATE OF SERVICE

I, Edward A. Wallace, hereby certify that a copy of the foregoing was filed using this Court's CM/ECF service, which will send notification of such filing to all counsel of record this 28th day of September 2015.

/s/ Edward A. Wallace
Edward A. Wallace