UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARIA DEMARIA, et al.,          )
                                )
                    Plaintiffs, )          Case No. 15 C 3321
                                )
        v.                      )
                                )          Judge John Robert Blakey
NISSAN NORTH AMERICA, INC.,     )
                                )
                    Defendants. )

<u>MEMORANDUM OPINION AND ORDER</u>

The plaintiffs, a putative class of owners and lessees of Nissan Altimas manufactured in 2002-2006 and Nissan Maximas manufactured in 2004-2008, sued Nissan North America, Inc. and Nissan Motor Company, Ltd. (collectively, "Nissan"), seeking a declaratory judgment that the class vehicles are defective. Plaintiffs also allege violation of the Magnuson-Moss Warranty Act; fraudulent concealment; negligence; unjust enrichment; and violation of various states' consumer protection laws. The parties stipulated to the dismissal of Nissan Motor Company from the case [56]. And Nissan North America, Inc. ("NNA") now moves to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim [50]. For the reasons explained below, the motion is granted.

<u>Factual Background & Procedural History</u>

Plaintiff Maria DeMaria initially sued Nissan on behalf of herself and all other Illinois owners of Nissan Altima automobiles for model years 2002-2006,

alleging that the cars were defective in that their floorboards did not withstand normal exposure to the elements, did not drain properly and rusted to the degree that they substantially deteriorated, allowing visible exposure to the roadway below. Complaint [1], ¶1. The initial complaint sought a declaratory judgment that the cars were defective and alleged violation of Illinois' Consumer Fraud and Deceptive Business Practices Act and Illinois' Uniform Deceptive Trade Practices Act, as well as unjust enrichment, fraudulent concealment and negligence. *Id.*, ¶¶41-118. Subject matter jurisdiction was predicated on diversity, 28 U.S.C. §1332(d). Complaint [1], ¶6.

DeMaria amended her complaint on July 24, 2015, expanding the scope of the class and the lawsuit by adding an additional class of vehicles, adding plaintiffs from several other states and alleging violations of those states' consumer protection laws. *See* First Amended Class Action Complaint ("FAC") [45]. According to the FAC, Plaintiffs' claims arise "from a safety defect plaguing a seven-model-year span of the popular Nissan Altima and Maxima vehicles. The defect affects the vehicles' floorboards – a metal panel that is the only real barrier between the road and drivers and their passengers." FAC [45], ¶1. The defect "makes the Altima and Maxima floorboards prone to severe rust and corrosion" which is often not visible to vehicle owners and occupants "until the corrosion has progressed from the inside to the exterior underside of the vehicle," often resulting in "gaping holes" so large "that a passenger's foot or a large rock could fit through the gap before he or she realizes that the floorboard has been compromised." *Id.*, ¶2. The FAC

alleges that "Nissan has known of the defect for many years" and has "concealed the defect in order to sell more vehicles and to avoid bearing the resulting repair costs (which can be hundreds or thousands of dollars)." *Id.*, ¶3.

The First Amended Complaint initially named 18 plaintiffs who are citizens and residents of 16 states: Illinois (Maria DeMaria), as well as Alabama, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Missouri, New Hampshire, New Jersey, New York, Ohio, Pennsylvania and Virginia. FAC, ¶¶4-21. On December 28, 2015, plaintiff Nitzali Beltran-Ashline, a citizen and resident of Massachusetts, submitted a notice of voluntary dismissal without prejudice [66], though Massachusetts is still represented by named plaintiff Dennis Bird. Thus, presently before the Court are the claims of 17 named plaintiffs, involving 16 states. The FAC alleges that defendant Nissan North America is a California Corporation with its principal place of business in Franklin, Tennessee, and a registered agent in Sacramento, California. FAC, ¶22.

With regard to the substance of the allegations, the FAC alleges that the subject vehicles "utilize a unibody construction where the vehicle's frame and body are a combination of structural and semi-structural panels that are welded together, forming a single unit" and that each panel is "dependent upon the adjacent panels to give the vehicle strength and rigidity," which "results in a single fully integrated body structure." FAC, ¶30. According to the FAC, the "unibody underbody" adds strength to the unibody structure and prevents the elements and road debris from entering the car, and therefore, it must resist rusting and

corrosion. *Id.* One part of the unibody underbody – the front floor pan or floorboard – "is a single piece of metal that spans the front driver and passenger compartments forming the floor of the vehicle for the front passenger and driver." *Id.,* ¶31. The floor pan is covered in carpet. *Id.* It is "intended to last the life of the vehicle" and is not something "owners or service technicians would expect to repair or replace during the vehicle's anticipated useful life." *Id.,* ¶31.

The FAC alleges that "Nissan and the automotive industry have known for decades that rust and corrosion may cause floorboards to degrade." *Id.,* ¶32. Plaintiffs allege that:

> All modern vehicle designs assume moisture will be routinely introduced to the vehicle's interior and will come in contact with the floorboard (for example, ingress during rain or snow, car washing, or when passengers eat or drink in the passenger cabin). When proper care and expense is devoted upfront, manufacturers can largely eliminate the risk of floorboard rust and corrosion. In fact, due to vast improvements in manufacturing and design technologies, motor vehicles manufactured in recent decades experience significantly reduced levels of corrosion.
>
> Unfortunately, Nissan elected to produce and sell Class Vehicles with inadequate floorboard corrosion protection–despite advancements in technologies for corrosion prevention, and despite the safety risks corroding floorboards present. Standard corrosion prevention techniques include the use of corrosion-resistant materials, coated steels, sealers, and polymers. In Class Vehicles, however, Nissan opted to deviate from optimal corrosion prevention, manufactured Class Vehicles on which moisture does not dissipate efficiently when in contact with the metal floorboard, and produced floorboards that corrode at an accelerated rate, rust, and become structurally unsound. This deviation occurred in or around 2001, when Nissan made a switch in the steel sheet used in the body of Class Vehicles. FAC, ¶¶32-34.

Plaintiffs allege that the "defect was known to Nissan immediately." *Id.,* ¶35. They allege that it has long been industry standard to perform a number of presale tests to assess components such as the floorboard for any tendency to corrode" and that it is "not plausible that Nissan could have performed comprehensive testing of this nature without detecting the defect." *Id.* Thus, Plaintiffs allege, Nissan "knew of the defect, both from its production experience and its extensive pre-release testing, since 2001, when it first sold and leased Class Vehicles. Yet Nissan continued to sell and lease new Class Vehicles with this defect for about seven more years. All the while, Nissan received data confirming the problem, ranging from customer complaints to warranty claims." *Id.,* ¶36. Plaintiffs allege that "it is not difficult to surmise what Nissan was learning in the early to mid-2000s"; they allege that the warranty data would show that "a worrisome percentage of its customers were submitting corrosion related warranty claims. And complaining drivers have been very vocal about the defect given the danger it poses." *Id.,* ¶37.

Indeed, the FAC alleges, Nissan has acknowledged internally and through non-public communications with its dealerships that Class Vehicles are defective, leading to floorboard rusting and corrosion." *Id.,* ¶39. Plaintiffs cite a technical service bulletin applying to all 2002-2006 Altimas and all 2004-2008 Maximas calling for a floor pan repair because of the common development of floorboard rust and corrosion. *Id.,* ¶39.

Plaintiffs allege that "more than 400 drivers [have complained] to the National Highway Traffic Safety Administration (NHTSA) about the problem—a

large number given that many drivers are not familiar with the NHTSA and instead complain, if at all, directly to Nissan or one of its dealerships." FAC, ¶41. The FAC includes a sampling of complaints from the NHTSA's website and other websites: some complain about holes in the floor of 2003 Nissan Altimas, which were discovered in 2009; another complains about holes in a 2004 Maxima discovered in 2015; several complain about holes in undisclosed model years being discovered in 2013 and 2015; one complains about a hole in a 2004 model that was discovered after 90,000 miles (year not disclosed). FAC, ¶¶41-43.

The FAC also includes allegations relating to each of the named plaintiffs. Plaintiff DeMaria purchased her used 2005 Nissan Altima in 2010 in Illinois and discovered in the summer of 2014 that the floorboards were completed rusted out; a Nissan dealership told her that it would cost approximately $3,000 to repair the damage and refused to cover the repair costs. FAC, ¶¶46-49.

Plaintiff Sheri Grimm purchased her used 2002 Altima in 2006 in Missouri and "discovered significant rust on the underside of her floorboard" in 2015. *Id.,* ¶¶50-53.

Plaintiff Juanita Walker purchased her 2003 Altima in 2005 in Alabama and "discovered rust in her floorboards when she removed the floor mats for cleaning" at some unspecified time. *Id.,* ¶¶54-56.

Plaintiff Doug Burkholder purchased his 2005 Altima in 2014 in Indiana and, in April 2015, "discovered rust under his floorboards" that would cost $600 to patch.

*Id.,* ¶¶ 57-60. Burkholder's car failed to pass a state inspection because of the hole. *Id.,* ¶61.

Plaintiff Keith Siefken purchased his 2005 Altima in 2006 in Iowa and, in April 2015, discovered the rust in his driver's side floorboard during routine maintenance of the vehicle; the repairs were estimated to cost about $3,000. *Id.,* ¶¶62-65.

Plaintiff Herb Brown purchased his 2006 Altima in 2010 in Kansas and, in the fall of 2014, discovered rust under the floorboards during routine maintenance; Brown complained to Nissan about the rust and Nissan refused to assist him or pay for any repairs. *Id.,* ¶¶66-69. Brown received two estimates to repair the rust: one for approximately $2,800 and another for approximately $3,800. *Id.,* ¶70.

Plaintiff Candace Kixmiller purchased her 2002 Altima in 2004 in Kentucky and, in March 2015, "discovered significant rust under the floorboards of her vehicle"; she complaint about the rust to Nissan and was told the repairs would cost approximately $5,200. *Id.,* ¶¶71-75.

Plaintiff Roslyn Corbin purchased her new 2005 Altima from a Nissan dealership in Maryland in 2004 and, in October 2014, discovered the rust in her front floorboard when her mechanic was changing her brake pads. *Id.,* ¶¶76-78. Corbin received two estimates to patch the rust: one for approximately $700 and another for approximately $500. *Id.,* ¶¶76-79.

Plaintiff Dennis Bird purchased his 2006 Altima in 2006 in Massachusetts and, in November 2014, discovered the rust in his floorboards during a routine oil

change; he complained to Nissan about the rust and received a repair estimate of approximately $800. *Id.*, ¶¶80-84.

Plaintiff Donald Young purchased his 2006 Altima in 2007 in Michigan and discovered rust under his driver and passenger floorboards during a routine oil change in April 2015; he received a repair estimate of approximately $800. *Id.*, ¶¶90-93.

Plaintiff Twila Ashworth purchased her 2004 Altima in 2007 in Missouri. *Id.*, ¶¶94-95. She was told by a technician in late 2014 that there was a hole in the floorboard of her passenger seat and repaired the hole at a cost of about $350. *Id.,* ¶¶94-98.

Plaintiff Thomas Wilbur purchased his 2006 Altima in 2009 in New Hampshire and discovered rust under his front passenger floorboard during maintenance in March 2015; his repair shop told him his car would likely not pass state safety inspections unless the rust was repaired. *Id.,* ¶¶99-102.

Plaintiff Peter Petersen purchased his 2005 Altima in 2005 in New Jersey and discovered a hole in the passenger floorboard of his vehicle in late 2014 or early 2015. *Id.*, ¶¶103-106. Petersen repaired the hole himself at a cost of about $100. *Id.,* ¶107.

Plaintiff Joseph Miller purchased his new 2005 Altima from a Nissan dealer in New York in the summer of 2004 and discovered rust under his passenger floorboards in May 2015; he was told it would cost approximately $450 to patch the

rust. *Id.*, ¶¶108-111. He complained to the NHTSA and to his local Nissan dealership. *Id.*, ¶112.

Plaintiff Tammy Petty purchased her 2004 Maxima in August 2014 in Ohio and discovered rust in both front floorboards when her mechanic was replacing the brakes in early 2015. *Id.*, ¶¶113-114. Petty complained to Nissan after she discovered the rust, but has not received a response. *Id.*, ¶115.

Plaintiff Laurie Sauder purchased her 2004 Altima in 2011 in Pennsylvania and discovered rust during a multipoint inspection at a Nissan dealership at some unspecified time; she paid approximately $300 to have the rust patched. *Id.*, ¶¶116-119.

Finally, plaintiff Gary Olds purchased his new 2005 Altima in 2005 from a Nissan dealership in Virginia and discovered rust in his passenger side floorboard in May 2015 during a state safety inspection. *Id.*, ¶¶120-122. Olds' car failed the inspection because of the rust, and he spent approximately $150 to patch the rust so his car could pass inspection. *Id.*, ¶¶120-124.

The FAC alleges 21 causes of action. Counts One through Five are alleged on behalf of a nationwide class: (1) Count One seeks a declaratory judgment that the Class Vehicles are defective and that the defective nature of the Class Vehicles is material and requires disclosure to all members of the Class; (2) Count Two alleges violation of the Magnuson-Moss Warranty Act; (3) Count Three alleges fraudulent concealment; (4) Count Four alleges negligence; (5) Count Five alleges unjust enrichment; and (6) The remaining counts allege violations of various state

consumer protections laws and are asserted on behalf of a named plaintiff and a class of consumers in each of the relevant states.[1]  Plaintiffs seek a determination that this action may be maintained as a class action under Federal Rule of Civil Procedure 23 and a determination that Nissan's conduct was unlawful, unfair and/or deceptive or otherwise in violation of law.  They also seek money damages and an injunction, as well as attorneys' fees, costs and interest.

Plaintiffs initially named as defendants both Nissan Motor Company, Ltd. (i.e., the parent company headquartered in Japan), and Nissan's United States subsidiary, Nissan North America, Inc.  FAC, ¶22.  Plaintiffs dismissed their claims against Nissan Motor Co., Ltd., without prejudice [56], leaving only NNA, which now moves to dismiss the FAC in its entirety.

## Discussion

The case is before the Court on NNA's motion to dismiss the FAC.  NNA argues that the out-of-state plaintiffs' claims must be dismissed under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.  They also argue that Plaintiffs' fraud claims must be dismissed under Rule 12(b)(6) because the FAC alleges no facts showing that NNA knew about the alleged defect at the time of sale.

---

[1] Count Six alleges violation of the Alabama Deceptive Trade Practices Act; Counts Seven and Eight allege, respectively, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act and the Illinois Uniform Deceptive Trade Practices Act; Count Nine alleges violation of the Iowa Consumer Frauds Act; Count Ten alleges violation of the Kansas Consumer Protection Act; Count Eleven alleges violation of the Kentucky Consumer Protection Act; Count Twelve alleges violation of the Maryland Consumer Protection Act; Count Thirteen alleges violation of the Michigan Consumer Protection Act; Count Fourteen alleges violation of the Missouri Merchandising Practices Act; Count Fifteen alleges violation of the New Hampshire Consumer Protection Act; Count Sixteen alleges violation of the New Jersey Consumer Fraud Act; Counts Seventeen and Eighteen allege, respectively, violation of sections 349 and 350 of the New York General Business Law; Count Nineteen alleges violation of the Ohio Consumer Sales Practices Act; Count Twenty alleges violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; and Count Twenty-One alleges violation of the Virginia Consumer Protection Act.

NNA also seeks dismissal of Plaintiffs' warranty and negligence claims for failure to state a claim. The Court considers the claims and arguments below.

I. <u>Personal Jurisdiction</u>

Plaintiffs bear the "burden of establishing personal jurisdiction." *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 799 (7th Cir. 2014). Where, as here, the Court resolves the motion on the papers, without an evidentiary hearing, Plaintiffs need only establish a *prima facie* case of personal jurisdiction. *Kipp v. Ski Enterprise Corp. of Wisconsin, Inc.*, 783 F.3d 695, 697 (7th Cir. 2015).

Generally, this Court is permitted to exercise personal jurisdiction over out-of-state defendants when the defendant has "certain minimum contacts with [Illinois] such that maintenance of the suit [here] does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)(quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). There are two types of personal jurisdiction: general jurisdiction, which exists only when the party's affiliations with Illinois "are so constant and pervasive 'as to render [it] essentially at home" here, *Daimler AG v. Bauman*, 134 S.Ct. 746, 751 (2014)(quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011)); and specific jurisdiction, which is "case-specific" and exists where the plaintiff's claim is "linked to the [defendant's] activities or contacts with" Illinois. *Kipp*, 783 F.3d at 697-98. Nissan argues that neither type of personal jurisdiction properly lies here.

A.     General Jurisdiction

General jurisdiction over a foreign corporation is properly asserted "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler*, 134 S. Ct. at 754 (quoting *Goodyear*, 131 S.Ct. at 2851; *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 & n.9 (1984)).  In *Daimler*, Argentinian residents brought suit against a German corporation in the district court for the Northern District of California. The Supreme Court held that due process did not permit the exercise of general jurisdiction over the corporation in California because the corporation was in no sense "at home" in that state: it was not incorporated in California and did not have its principal place of business there; nor were the corporation's "affiliations with the State . . . so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler*, 134 S.Ct. at 761 (quoting *Goodyear*, 131 S.Ct. at 2851; Helicopertos, 466 U.S. at 414, n.9).

The Seventh Circuit has explained that the assertion of general jurisdiction over a foreign defendant requires "more than the 'substantial, continuous, and systematic course of business' that was once thought to suffice" and that due process permits courts "to exercise general jurisdiction only when 'the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit" on causes of action "arising from dealings entirely distinct from those activities.'" *Kipp*, 783 F.3d at 698 (quoting *Daimler*, 134 S.Ct. at 760-61).

Here, the FAC alleges that NNA is a California corporation with its headquarters and principal place of business in Tennessee. FAC [45], ¶22. The FAC also alleges that Nissan (the term assigned by Plaintiffs to refer collectively to NNA and Nissan Motor Company) is "registered to conduct business in Illinois; has sufficient minimum contacts in Illinois; and intentionally avails itself of the markets within Illinois through promotion, sale, marketing and distribution of its vehicles." *Id.*, ¶25. By themselves, these allegations do not permit the Court to infer that NNA is "essentially at home" in Illinois, nor do they establish that this is "one of those rare situations" where the exercise of such broad jurisdiction is justified. *E.g., Kipp*, 783 F.3d at 699. Indeed, Plaintiffs concede that general jurisdiction is lacking, and the Court agrees.

B.  Specific Jurisdiction

That leaves specific jurisdiction. Specific jurisdiction is proper when a defendant "has 'purposefully directed' his activities at residents of the forum . . . and the litigation results from the alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)(quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *Helicopteros Nacionales*, 466 U.S. at 414). The "contacts supporting specific jurisdiction can take many different forms" but ultimately, "the key is purposefulness" and the "due process clause will not permit jurisdiction to be based on contacts with the forum that are random, fortuitous, or attenuated.'" *Linkepic Inc v. Vyasil, LLC*, No. 12-cv-09058, 2015 WL 7251936, at *4 (N.D. Ill. Nov. 17, 2015)(quoting *uBID, Inc. v. GoDaddy*

*Grp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010)). Additionally, establishing minimum contacts is not enough. To justify the exercise of specific personal jurisdiction over NNA, the FAC would have to demonstrate "not only that the defendant [has] minimum contacts with the forum state but also that [Plaintiffs' claims] against the defendant 'arise out of or relate to' those contacts." *uBID,* 623 F.3d at 429 (quoting *Burger King*, 471 U.S. at 472-73; *Helicopteros Nacionales*, 466 U.S. at 414; *Tamburo v. Dworkin*, 601 F.3d 693, 708 (7th Cir. 2010)).

In *Walden v. Fiore*, the Supreme Court addressed "the 'minimum contacts' necessary to create specific jurisdiction." 134 S.Ct. 1115, 1121 (2014). There, Nevada residents filed suit in Federal District Court in Nevada against a Georgia police officer who seized cash from them at an airport in Georgia. The district court dismissed the suit for lack of personal jurisdiction, and the Ninth Circuit Court of Appeals reversed, finding that personal jurisdiction was justified based upon the officer's knowledge that his conduct would affect persons with significant Nevada connections. 134 S.Ct. at 1119. Noting that "the plaintiff cannot be the only link between the defendant and the forum," the Supreme Court reversed. *Id.* at 1124, 1126. Initially, the Court held that "the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* In evaluating the connection with the forum, courts must look to the *defendant's* conduct: "however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'" *Id.* at 1122 (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)). Additionally, the

"'minimum contacts' analysis looks to the defendant's contacts with the *forum State itself*, not the defendant's contacts with persons who reside there." *Walden*, 134 S.Ct. at 1122 (citing *International Shoe*, 326 U.S. at 319; *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)).

Here, Plaintiffs claim that specific personal jurisdiction exists based on their allegations that "Nissan is registered to conduct business in Illinois"; "intentionally avails itself of the markets within Illinois through the promotion, sale, marketing and distribution of its vehicles"; and "manufactures, markets, distributes and warrants automobiles in the United States." FAC, ¶¶25, 27.

Initially, the Court's analysis is complicated by the fact that the Plaintiffs' allegations lump together both NNA and Nissan Motor Company. This makes it impossible to discern which of the alleged activities and contacts relate to NNA specifically, as opposed to "Nissan" – the term Plaintiffs use to refer to both NNA and Nissan Motor Company, which has been dismissed from the lawsuit. The allegation relating to the manufacturing, marketing, distribution, and warranting of cars is similarly cloudy because it shows only that such activities were directed at the United States, and says nothing about whether those activities were specifically directed to the forum State. As a result, the current allegations do not enable this Court to say, at this juncture, that NNA engaged in any relevant activities in Illinois for the purposes of specific personal jurisdiction.

Furthermore, even if the Court construes the FAC's allegations to find that NNA did engage in relevant activities in Illinois, and thus, promote, sell, market

and distribute the purportedly defective cars here, that would primarily tend to support the exercise of personal jurisdiction over NNA for DeMaria's claims alone. The FAC alleges that DeMaria is the only plaintiff who purchased her car in Illinois and the only plaintiff whose claim can fairly be said to arise out of any activity taking place in, or directed at, Illinois. The FAC does not allege that anything NNA did in Illinois had anything to do with any of the other plaintiffs' claims, or that any of their claims arose out of activities by NNA tied to Illinois. Thus, at most – construing the allegations in the light most favorable to the Plaintiffs and assuming that NNA's allegation that Nissan "manufactures, markets, distributes and warrants automobiles in the United States" can fairly be read to allege that NNA does so in Illinois, personal jurisdiction would exist only as to DeMaria. Even with a liberal construction, the current allegations of the FAC fail to provide a sufficient basis for asserting personal jurisdiction as to the remaining plaintiffs' claims.

As an alternative, Plaintiffs argue that, because specific personal jurisdiction exists as to DeMaria's claim, pendent personal jurisdiction exists as to all of the other claims. "Under the doctrine of pendent personal jurisdiction, a court may exercise its discretion to hear claims as to which personal jurisdiction may otherwise be lacking if those claims arise out of a common nucleus of facts with claims as to which personal jurisdiction exists." *Rice v. Nova Biomedical Corp.*, 763 F. Supp. 961, 966 (N.D. Ill. 1991)). "Pendent personal jurisdiction typically is invoked in cases where the exclusive basis for personal jurisdiction is the presence of a federal claim that provides for extra-territorial service of process." *Id.* (citing

cases).  Consequently, it is "typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction." *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).

For example, in *Robinson Engineering Co. Pension Plan and Trust v. George*, 223 F.3d 445 (7th Cir. 2000), the plaintiff sued several defendants for violation of the Securities Exchange Act of 1934 and the Organized Crime Control Act of 1970, alleging as well supplemental state law claims for rescission and fraud.  *Id.* at 447. The plaintiff served the defendant at his home in Canada and, when the defendant failed to appear based upon that service of process, obtained a default judgment against him for more than $950,000.  *Id.* at 447-48.  Noting that the Securities Exchange Act of 1934 authorized worldwide service of process on a defendant and that all of the federal statutes at issue authorized nationwide service of process, the Seventh Circuit concluded that service in Canada was authorized as to the Securities Act claim and that personal jurisdiction as to the other claims was also proper under the idea of pendent personal jurisdiction, because those claims arose out of the same nucleus of operative fact as the securities claims.  *Id.* at 449.  Here, the FAC does not assert a single claim in which there is nationwide personal jurisdiction, nor is it clear from the allegations that the claims of the out-of-state plaintiffs, as presently pled, arise out of a common nucleus of operative fact.

As presently pled, Plaintiffs' FAC seeks to hold NNA accountable in Illinois for claims arising out of activities that ostensibly have no connection to Illinois, based solely upon a single transaction that occurred in Illinois and which may or may not have arisen out of any specific activity NNA directed at Illinois. Plaintiffs argue that: "DeMaria's cause of action arises out of Nissan's purposeful contacts with Illinois. Nissan sold the vehicle in Illinois, thus creating contacts with Illinois and targeting those contacts at Illinois, Nissan further refused to cover the cost of the requested repairs, resulting in the substantive legal dispute at issue here." Response [55], p. 8. If that is the factual basis for jurisdiction, then the claims of the other plaintiffs (who were unaffected by such NNA activity in Illinois) do not arise out of a common nucleus of operative fact with DeMaria's claim. No plaintiff but DeMaria purchased a car in Illinois or had a repair bill rejected in Illinois, and the FAC offers no basis to infer that any other plaintiff was affected by NNA's Illinois activities.

In response to the motion to dismiss, Plaintiffs suggest that the common nucleus of operative facts stems from the defective nature of the floorboards and Nissan's knowledge. *Id.*, pp. 8-9. But, other than with respect to DeMaria, the FAC does not include any factual allegation or theory tying the defective nature of the floorboards, or any purported knowledge on the part of Nissan, to the State of Illinois. Nor does the FAC allege that Nissan's decision to use an inferior anti-corrosive product is in any way tied to Illinois. In short, as drafted, the FAC fails to properly connect those overarching activities to the forum State, or otherwise

properly connect them to the claims of other plaintiffs. There is only DeMaria. And that is not enough, because the "plaintiff cannot be the only link between the defendant and the forum." *Walden*, 134 S.Ct. at 1122.

Under the circumstances of this case, where each plaintiff's claim is predicated on the law of the particular state where he or she purchased a car and the claims of the other plaintiffs as alleged remain unrelated to anything that transpired in Illinois, imposing personal jurisdiction for all of the claims because specific jurisdiction may lie as to this one plaintiff's claims would run afoul of the traditional notions of fair play and substantial justice that form the bedrock of any court's personal jurisdiction analysis. Given the current allegations, the Court is not persuaded that pendent personal jurisdiction is established simply because specific jurisdiction may exist as to DeMaria's claims.

Based upon the FAC, the Court finds that personal jurisdiction lies only as to claims that can fairly be said to arise out of NNA's activities in, or directed at, the State of Illinois, and is thus lacking as to the claims of every named plaintiff but Maria DeMaria. Accordingly, the Court grants the motion to dismiss for lack of personal jurisdiction as to Counts Six and Nine through Twenty-One, as well as Counts One through Five to the extent they are brought on behalf of plaintiffs' whose claims do not arise out of NNA's Illinois activities. If Plaintiffs elect to file an amended complaint, they should amend their allegations to provide a clear basis for personal specific jurisdiction as to any dismissed claims, and any additional support

for DeMaria's claims as well, to the extent they are able to do so consistent with their obligations under Rule 11.

II.     Failure to State A Claim

NNA also seeks to dismiss the FAC for failure to state a claim under Rule 12(b)(6). Under Rule 12(b)(6), this Court must construe the FAC in the light most favorable to the plaintiffs, accept as true all well-pleaded facts and draw reasonable inferences in their favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013); *Long v. Shorebank Development Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Statements of law, however, need not be accepted as true. *Yeftich*, 722 F.3d at 915. Rule 12(b)(6) limits this Court's consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

To survive NNA's motion under Rule 12(b)(6), the FAC must "state a claim to relief that is plausible on its face." *Yeftich*, 722 F.3d at 915. For a claim to have facial plausibility, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "amount of factual allegations required to state a plausible claim for relief depends on the complexity of the legal theory alleged," but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008)).

II.     Analysis of Plaintiffs' Claims

As explained, the FAC seeks a declaratory judgment that the Class Vehicles are defective and alleges breach of warranty under Magnusson-Moss; fraudulent concealment, negligence and unjust enrichment, as well as violation of the Illinois Deceptive Trade Practices Act, the Illinois Consumer Protection Act and the consumer protection acts of 13 other states.

A.      Plaintiffs' Fraud Claims

The Court first considers Plaintiffs' claims of fraudulent concealment (Count Three) and their claims alleging violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") and the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"). Each of these claims requires either an affirmative misrepresentation or an omission of material fact, and, here Plaintiffs claim that Nissan fraudulently omitted material information regarding the defect in the floorboards of the relevant model years of the Altima and Maxima.

To state a claim of fraudulent concealment in Illinois "a plaintiff must allege that: '(1) the defendant concealed a material fact under circumstances that created a duty to speak; (2) the defendant intended to induce a false belief; (3) the plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and (5) the plaintiff's reliance resulted in

damages.'" *Ruderman v. Freed*, No. 14 C 9079, 2015 WL 5307583, at *4 (N.D. Ill. Sept. 10, 2015)(quoting *Bauer v. Giannis*, 834 N.E.2d 952, 957-58 (Ill. App. Ct. 2005)). "A duty to disclose generally arises in two circumstances: (1) when the defendant owes the plaintiff some fiduciary duty to make full and fair disclosure and fails to correct a misapprehension of a material fact; or (2) when the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension." *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F. Supp. 1358, 1366-67 (N.D. Ill. 1996)(citations omitted). With respect to the second circumstance, Illinois courts have held that while "silence in a business transaction does not necessarily amount to fraud, silence accompanied by deceptive conduct or suppression of material facts results in active concealment," *Munjal v. Baird & Warner, Inc.*, 485 N.E.2d 855, 862 (Ill. App. Ct. 1985), "and it then becomes the duty of the person to speak." *Russow v. Bobola*, 277 N.E.2d 769, 771 (Ill. App. Ct. 1972).

Deceptive conduct is similarly required under the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") and the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"). To state a claim under ICFA, a plaintiff must allege: "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) that the deception occur in a course of conduct involving trade and commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the deception." *Ruderman v. Freed*, No. 14 C 9079, 2015 WL 5307583, at *5 (N.D. Ill. Sept. 10, 2015)(quoting *Sound of Music Co. v. Minn. Min.*

& *Mfg. Co.*, 477 F.3d 910, 923 (7th Cir. 2007)).[2]  To state a claim under the IUDTPA, a consumer must allege facts showing that he is likely to be damaged by a defendant's deceptive trade practices or unfair competition.  *E.g., Reid v. Unilever U.S., Inc.*, 964 F.Supp. 2d 893, 918 (N.D. Ill. 2013).

Putting aside for the moment the question of whether Plaintiffs have actually alleged facts to establish each element of these claims, Plaintiffs' fraud claims must also meet the heightened pleading standard of Federal Rule if Civil Procedure 9(b). *McMahan v. Deutsche Bank AG*, 938 F.Supp.2d 795, 803-06 (N.D. Ill. 2013) (fraudulent concealment claims subject to heightened pleading requirements of Rule 9(b)); *Aliano v. Louisville Distilling Co.*, No. 15 C 00794, 2015 WL 4429202, at *5 (N.D. Ill. July 20, 2015)("Claims brought under the ILCFA must meet the heightened pleading standard of Rule 9(b), which applies to the elements that constitute fraud)(citing *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736-37 (7th Cir. 2014); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446-47 (7th Cir. 2011)).

Specifically, Rule 9(b) requires that, when alleging fraud, a plaintiff "must state with particularity the circumstances constituting the fraud," and a complaint

---

[2] Although the Court has determined that personal jurisdiction does not lie with respect to the out-of-state plaintiffs' claims, the Court notes that the other states' consumer fraud statutes similarly require presale knowledge of a product defect. *E.g., Sam v. Beaird*, 685 So.2d 742, 744 (Ala. Ct. App. 1996); Kansas Statutes Annotated §50-626(b)(1)(a deceptive act is one made knowingly); *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988)(Massachusetts Consumer Protection Act); *Allen v. Bank of America, N.A.*, 933 F.Supp. 2d 716, 727 (D. Md., 2013)(Maryland Consumer Protection Act); *Woods v. Maytag Co.*, No. 10-CV-0559 ADS WDW, 2010 WL 4314313, at *16 (E.D.N.Y. Nov. 2, 2010)(New York General Business Law §349); *Cox v. Sears Roebuck & Co.*, 138 N.J.2, 18 (N.J. 1994)(New Jersey Consumer Fraud Act); *Lambert v. Downtown Garage, Inc.*, 262 Va. 707, 714 (Va. 2001)(Virginia Consumer Protection Act).  Thus, even if personal jurisdiction could properly be imposed with respect to the out-of-state plaintiffs' claims, the claims would nonetheless be dismissed based upon the factual allegations.

"alleging fraud must provide 'the who, what, when, where, and how.'" *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007)(quoting *U.S. ex rel. Gross v. AIDS Research Alliance–Chicago*, 415 F.3d 601, 605 (7th Cir. 2005); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). Thus, here, Plaintiffs must provide "greater detail about the circumstances surrounding the omissions, including when and where they occurred, and what material facts should have been disclosed at what times." *McMahan*, 938 F.Supp.2d at 805-06.

Plaintiffs' FAC fails to meet these standards. Plaintiffs have not alleged what material facts Nissan should have disclosed, to whom it should have disclosed them, or when it should have disclosed them. Indeed, it is not even clear that Plaintiffs are alleging omissions in the sales transactions involving the named plaintiffs, many of whom (like DeMaria) purchased their cars in transactions that did not even involve Nissan or its agents. Plaintiff DeMaria purchased her 2005 Nissan Altima in 2010 in Illinois. The FAC does not allege that DeMaria purchased her car from Nissan or from anyone acting on behalf of Nissan. Nor does the FAC allege what Nissan should have disclosed to DeMaria or when it should have done so. This latter deficiency is true for the claims of all of the named Plaintiffs, even those who are alleged to have purchased their cars from Nissan directly.

At its core, the FAC alleges that Nissan knew the floorboards were defective and failed to disclose that fact in general. NNA argues that Plaintiffs failed to allege what was defective about the floorboards that NNA allegedly knew but concealed. To be sure, the allegedly concealed fact cannot be simply that metal

rusts over time in general. Rather Plaintiffs assert a theory in which NNA knew there was something unspecified about the materials used or the construction of the unibody that caused the floorboards to rust prematurely and severely. Plaintiffs do not specifically allege what that defect was, nor do they establish any knowledge on the part of NNA at the time of any relevant sale.

Instead, the FAC alleges that, in or around 2001, Nissan "opted to deviate from optimal corrosion prevention, manufactured Class Vehicles in which moisture does not dissipate efficiently when in contact with the metal floorboard, and produced floorboards that corrode at an accelerated rate, rust, and become structurally unsound. FAC [45], ¶¶34. The FAC further alleges that the "defect was known to Nissan immediately." *Id.*, ¶35. The FAC then alleges that it has "long been industry standard, including at Nissan, to perform a number of presale tests to assess components such as the floorboard for any tendency to corrode" and thus it "is not plausible that Nissan could have performed comprehensive testing of this nature without detecting the defect." *Id.*, ¶35.

None of these allegations establishes knowledge by NNA at the time the Class Vehicles were purchased from Nissan. First, Plaintiffs do not allege that NNA performed the alleged testing or that it was required to perform such tests. In *Williams v. Yamaha Motor Corp.*, No. CV 13-05066 BRO, 2015 WL 2375906 (C.D. Cal. April 29, 2015), the court rejected similar allegations, noting that such allegations "require the Court to draw the inference that Defendant's *opportunity* to learn about this alleged defect before selling their engines to the public necessarily

means that they *did* learn about the defect." *Id.*, 2015 WL 2375906, at *9 (emphasis in original). As in *Williams,* there is an insufficient basis for the Court to infer that Nissan's opportunity to test means they tested and knew at the relevant point in time. As such, the current allegations relating to presale testing are not sufficient to establish knowledge.

Along similar lines, Plaintiffs allege that:

> Although Nissan's aggregated data, including warranty claims and customer complaints, are known only to Nissan, it is not difficult to surmise what Nissan was learning in the early to mid-2000s. With respect to warranty data, the Class Vehicles came with a stand-along, five-year warranty for corrosion, so Nissan needed to do nothing in the way of analytics to know that a worrisome percentage of its customers were submitting corrosion related warranty claims. And complaining drivers have been very vocal about the defect given the danger it poses. Although only a small percentage of those complaints are public, many more were made to Nissan directly, and they tend to report serious concern about the corrosion and rust, which can be seen in part in the photographs [attached to the FAC].

FAC [45], ¶37. These allegations are conclusory and do not establish that NNA had knowledge of the alleged defect at the time of sale. In fact, the complaints included in the FAC were made years after the cars were manufactured and sold by Nissan. Plaintiff DeMaria's car was manufactured in 2005. She purchased it in 2010 and discovered rust in the summer of 2014. Despite Plaintiffs' conclusory allegation that Nissan knew about the defect in 2001, nothing in the allegations provides a basis for the Court to draw this inference. Nor can the Court conclude that NNA knew about the defect in 2005, when the car DeMaria ultimately purchased was manufactured.

Similarly the allegations relating to customer complaints to Nissan dealerships and the NHTSA or other websites are insufficient. Each details facts showing that rust and corrosion were discovered years (in some cases a decade or more) after purchase. None establishes knowledge at the time of sale. The FAC does not include a single complaint that was on file as of the time the Class Vehicles were sold by Nissan. And, although the FAC alleges that Nissan issued a technical service bulletin addressing floor pan repair, FAC, ¶¶39-40, it does not allege when Nissan issued the bulleting and, therefore, cannot establish knowledge at the time of sale for any named Plaintiff.

Plaintiffs' fraudulent concealment and deceptive practices claims fail to plead fraud with the degree of particularity required by Rule 9(b) and otherwise fail to state a claim for which relief may be granted. Accordingly, Counts Three, Seven and Eight are dismissed.

B.     Magnusson-Moss

In Count Two the FAC, Plaintiffs allege that "Nissan provided all purchasers and lessees of Class Vehicles with an implied warranty, but breached this warranty as described in more detail above, including by selling and leasing Class Vehicles that are equipped with defective floorboards that are prone to rusting at a level that makes the vehicles unfit for the ordinary and intended purpose for which such vehicles are used." FAC, ¶148. Plaintiffs further allege that "Nissan's breach of warranty has deprived Plaintiffs and other Class members of the benefit of their bargain." *Id.,* ¶149.

The Magnusson-Moss Warranty Act ("MMWA"), 15 U.S.C. §2301, et seq., "allows consumers to enforce written and implied warranties in federal court, borrowing state law causes of action." *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004), *quoted in Federico v. Freedomroads RV, Inc.*, No. 09-CV-2027, 2010 WL 4740181, at *5 (N.D. Ill. Nov. 10, 2010). "The MMWA 'authorizes a consumer to sue for breach of a state law implied warranty.'" *Federico*, No. 09-CV-2027, 2010 WL 4740181, at *6 (quoting *Semetikol v. Monaco Coach Corp.*, 582 F.Supp.2d 1009, 1026 (N.D.Ill. 2008)); *see also* 15 U.S.C. § 2301(7)(defining an implied warranty as "an implied warranty arising under State law . . . in connection with the sale by a supplier of a consumer product"). Illinois statutory law provides that unless "excluded or modified" a warranty that "the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 810 Ill. Comp. Stat. 5/2–314(1).

Although the FAC alleges that Nissan is a "supplier" and "warrantor" with respect to the sale of cars, the FAC does not allege that DeMaria purchased her car from Nissan. Nor does it allege that the circumstances of the transaction otherwise give rise to a warranty claim. Thus, at least as to DeMaria, the FAC does not establish the existence of an implied warranty and, therefore, cannot state a claim for breach of that warranty. Accordingly, the claim for breach of warranty (Count Two) is dismissed.

C.     Negligence

In Count Four, Plaintiffs allege negligence on behalf of a nationwide class. In a diversity case such as this, "a federal court looks to its forum state's choice-of-law rules to figure out the substantive law that must apply." *Duncan Place Owners Association v. Danze, Inc.*, No. 15 C 01662, 2015 WL 5445024, at *6 (N.D. Ill. Sept. 15, 2015)(citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006)). "Illinois has adopted 'the broad principle,' as articulated by the Restatement (Second) of Conflict of Laws, 'that the rights and liabilities as to a particular issue are to be governed by the jurisdiction which retains the "most significant relationship" to the occurrence and the parties.'" *Duncan Place*, 2015 WL 5445024, at *6 (quoting *Barbara's Sales, Inc. v. Intel Corp.,* 879 N.E.2d 910, 919 (Ill. 2007)). "In consumer-protection cases, Illinois conflicts law provides that 'where a plaintiff relies on a representation in the same state where that representation was made and received, the law of that state applies.'" *Duncan Place*, 2015 WL 5445024, at *6 (quoting *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D.Ill. 2008), aff'd, 612 F.3d 932 (7th Cir. 2010); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002)).

Although it is not entirely clear from the FAC what the alleged false representation was, if the representation concerned the implied non-defective condition of the floorboards at the time of the sale of the car to the named plaintiffs, then such a false representation would occur in the state in which each plaintiff purchased the car. The named plaintiffs would thus invoke the negligence laws of

their home states (there are 14 of them), as well as any other state in which a nationwide class member resides (potentially all 50 of them). *See Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D. Ill. 2008)("Applying Illinois' choice-of-law rules leads to the application of each state's consumer protection laws); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir. 2002)("If recovery for breach of warranty or consumer fraud is possible, the injury is decidedly where the consumer is located, rather than where the seller maintains its headquarters."). As to the only claims currently at issue (i.e., the Illinois-based claims), the allegations fail to state a claim for negligence under Illinois law.

To state a claim for negligence under Illinois law, a plaintiff must establish: (1) a duty of care owed by the defendant; (2) a breach of that duty; (3) an injury proximately caused by that breach; and (4) damages. *E.g., Freedom Mortgage Corp. v. Burnham Mortgage, Inc.*, 720 F. Supp. 2d 978, 992 (N.D. Ill. 2010)(citing *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d 249 (Ill. 2007)). "A duty of care arises when the nature of the plaintiff and defendant's relationship to one another is such that the law imposes upon the defendant an obligation of reasonable conduct for the plaintiff's benefit." *Lurgio v. Commonwealth Edison Co.*, 914 N.E.2d 659, 665 (Ill. App. Ct. 2009)(citing *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1057 (Ill. 2006).

The duty and corresponding breach alleged here stem from the notion that the Class Vehicles were defective and that Nissan failed to tell Plaintiffs about the defect. As noted above, however, the FAC does not allege that DeMaria purchased

her car from Nissan. Nor does the FAC allege facts from which the Court could reasonably infer a legal duty on the part of Nissan to advise DeMaria of issues concerning the floorboards when she purchased her used car from an unknown seller. To be sure, a duty of care would arise as to those plaintiffs who purchased their cars from Nissan or its agents or affiliates. But that is not the case with DeMaria. And the claims of the named plaintiffs who do fit that bill are otherwise dismissed for lack of personal jurisdiction. Plaintiffs' negligence claim, as presently pled, is therefore dismissed for failure to state a claim upon which relief may be granted.

D.  <u>Unjust Enrichment</u>

In a somewhat conclusory fashion, Plaintiffs allege that "Nissan had knowledge of the defect and the serious safety risks it poses, which it failed to disclose to Plaintiffs and the Nationwide Class" and that, as a result of "Nissan's wrongful and fraudulent acts and omissions, as set forth above, Nissan obtained monies which rightfully belong to Plaintiffs and the Nationwide Class to the detriment of Plaintiffs and the Nationwide Class." FAC, ¶¶179-180. The FAC does not allege, however, that DeMaria purchased her car from Nissan, and it is, therefore, not clear that Nissan was enriched at all by the relevant transaction. Additionally, the Court has determined that Plaintiffs have failed to sufficiently state a claim for a violation of any of the relevant statutes or for fraudulent concealment. As a result, the Court finds that Plaintiffs' unjust enrichment claim, which is predicated on such violations, fails as well. Without evidence of a statutory

violation or wrongful act, there can be no evidence that the defendant was enriched (justly or unjustly) thereby. *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 765 (7th Cir. 2015). Plaintiffs' unjust enrichment claim is dismissed.

Conclusion

For the reasons explained above, the Court finds that personal jurisdiction over NNA is lacking as to the claims of the out-of-state plaintiffs, but does exist as to the claims asserted on behalf of Plaintiff Maria DeMaria and the class she purports to represent (that is, individuals whose purchase of Class Vehicles is linked to NNA's activities within the state of Illinois). The Court finds, however, that Plaintiffs have failed to state a claim for fraudulent concealment, negligence, unjust enrichment or violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act or the Illinois Uniform Deceptive Trade Practices Act.

Accordingly, NNA's motion to dismiss [50] is granted, and the FAC is dismissed in its entirety. The consumer protection claims for violation of the laws of states other than Illinois (Counts Six and Nine through Twenty-One) are dismissed for lack of personal jurisdiction. The declaratory judgment, breach of warranty, fraudulent concealment, negligence and unjust enrichment claims (Counts One through Five) are similarly dismissed for lack of personal jurisdiction to the extent they are asserted on behalf of plaintiffs whose claims do not arise out of NNA's activities within the State of Illinois. Plaintiffs' claims for violation of the ICFA and the IUDTPA (Counts Seven and Eight) are dismissed for failure to state a claim, as

are Counts One through Five, to the extent they are asserted on behalf of plaintiffs whose claims do arise out of NNA's activities within the State of Illinois.

Plaintiffs are given leave to amend their complaint to address the deficiencies noted herein, to the extent they are able to do so consistent with their obligations under Rule 11.

Date: February 1, 2016

ENTERED:

_J_____
United States District Judge